# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

IDA C. BEGAY, NITA R. AUGUSTINE, KEE
AUGUSTINE, KEE SANDOVAL, GEORGE
HARKES, JR., ALICE J. WHITE, BEN C.
YAZZIER, LOUISE J. YAZZIE, and SHII
SHI KEYAH ALLOTTEES ASSOCIATION
on their own behalf and on behalf of all those
similarly situated,

       Plaintiffs

vs.                                                                          No. CIV 09-0137 JB/RLP

PUBLIC SERVICE COMPANY OF NEW MEXICO
(PNM), EL PASO CORPORATION, ENTERPRISE
PRODUCTS PARTNERS L.P., KINDER MORGAN,
NEW MEXICO GAS COMPANY, TRANSWESTERN
PIPELINE CO., LLC, TUCSON ELECTRIC POWER
COMPANY, WESTERN REFINING, INC., KEN
SALAZAR, SECRETARY OF THE INTERIOR, et al.,
and THE UNITED STATES OF AMERICA,

       Defendants.

## **<u>MEMORANDUM OPINION</u>**[1]

    **THIS MATTER** comes before the Court on (i) the Federal Defendants' Motion to Dismiss

---

[1] The Court has previously entered an order granting: (i) the Federal Defendants' Motion to Dismiss and Memorandum in Support (Doc. 44); (ii) Defendant Transwestern Pipeline Company, LLC's Motion to Dismiss Plaintiffs' Claims for Ejectment or Removal of Pipeline and for Trespass for Lack of Jurisdiction (Doc. 53); (iii) El Paso's Motion to Dismiss pursuant to Rule 12(b)(6) (Doc. 54); (iv) El Paso's Motion to Dismiss Pursuant to Rule 12(b)(1) and 12(b)(7) (Doc. 55); (v) the Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 56); and (vi) the Plaintiffs' Motion for Leave to File Sur-Reply to Pages 11-16 of "El Paso's Reply Memorandum in Support of Motion to Dismiss Pursuant to Rule 12(b)(6)" (Doc. 82), denying: (i) the Federal Defendants' Motion to Strike (Doc. 45); and (ii) the Motion to Strike Special Master Report (Exhibit A) from Plaintiffs' Complaint (Doc. 52), denying as moot: (i) the Joint Motion to Dismiss and Memorandum in Support of Defendant Enterprise Products Partners, L.P., Kinder Morgan, Transwestern Pipeline Company, LLC, Western Refining, Inc., Public Service Company of New Mexico, New Mexico Gas Company, Inc., and Tucson Electric Power Company Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(7) (Doc. 57); and (ii) the Joint Motion to Dismiss and Memorandum in Support of Defendants Enterprise Products Partners, L.P., Kinder Morgan, Transwestern Pipeline Company, LLC, Western Refining, Inc., Public Service Company of New Mexico, New Mexico Gas Company, Inc., and Tucson Electric Power Company Pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 58), and dismissing the Plaintiffs' case. <u>See</u> Order, filed March 31, 2010 (Doc. 98). This opinion is intended to explain more fully the Court's reasoning for its previous Order.

and Memorandum in Support, filed July 1, 2009 (Doc. 44); (ii) the Federal Defendants' Motion to Strike, filed July 1, 2009 (Doc. 45); (iii) Motion to Strike Special Master Report (Exhibit A) from Plaintiffs' Complaint, filed July 15, 2009 (Doc. 52); (iv) Defendant Transwestern Pipeline Company, LLC's Motion to Dismiss Plaintiffs' Claims for Ejectment or Removal of Pipeline and for Trespass for Lack of Jurisdiction, filed July 15, 2009 (Doc. 53); (v) El Paso's Motion to Dismiss Pursuant to Rule 12(b)(6), filed July 15, 2009 (Doc. 54); (vi) El Paso's Motion to Dismiss Pursuant to Rule 12(b)(1) and 12(b)(7), filed July 15, 2009 (Doc. 55); (vii) Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed July 15, 2009 (Doc. 56); (viii) Joint Motion to Dismiss and Memorandum in Support of Defendants Enterprise Products Partners, L.P., Kinder Morgan, Transwestern Pipeline Company, LLC, Western Refining, Inc., Public Service Company of New Mexico, New Mexico Gas Company, Inc., and Tucson Electric Power Company Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(7), filed July 15, 2009 (Doc. 57); (ix) Joint Motion to Dismiss and Memorandum in Support of Defendants Enterprise Products Partners, L.P., Kinder Morgan, Transwestern Pipeline Company, LLC, Western Refining, Inc., Public Service Company of New Mexico, New Mexico Gas Company, Inc., and Tucson Electric Power Company Pursuant to Fed. R. Civ. P. 12(b)(6), filed July 15, 2009 (Doc. 58); and (x) the Plaintiffs' Motion for Leave to File Sur-Reply to Pages 11-16 of "El Paso's Reply Memorandum in Support of Motion to Dismiss Pursuant to Rule 12(b)(6)," filed December 10, 2009 (Doc. 82). The Court will deny the motions to strike and will grant the Plaintiffs' motion for leave to file sur-reply.  Because the claims against the Federal Defendants[2] are not ripe for review and because the Plaintiffs lack standing to bring this action individually or as a class, the Court will grant the Federal Defendants' motion to dismiss.

---

[2] Salazar and the United States are referred to together herein as the "Federal Defendants."

Because the Plaintiffs fail to allege a claim upon which relief can be granted under their constructive trust theory, the Court will grant El Paso Corporation's[3] motion to dismiss pursuant to rule 12(b)(6). Because the Federal Energy Regulatory Commission ("FERC") has exclusive jurisdiction over claims involving interstate gas line pipelines, the Court will also grant Transwestern Pipeline Company, LLC's motion to dismiss regarding ejectment, removal of pipeline and trespass. Accordingly, the Court will dismiss Plaintiffs' Complaint without prejudice.

### FACTUAL BACKGROUND

Plaintiffs Ida C. Begay, Nita R. Augustine, Kee Augustine, Kee Sandoval, George Harkes, Jr., Alice J. White, Ben C. Yazzie, and Louise J. Yazzie are members of the Navajo Nation in Arizona, New Mexico, and Utah.  See Complaint for Equitable and Legal Relief ¶ 1, at 2, filed February 11, 2009 (Doc. 1)("Complaint").  The Navajo Nation is a federally recognized Indian tribe, and the individual Plaintiffs are residents of New Mexico.  See Complaint ¶ 1, at 2.  The individual Plaintiffs are also allottees who, pursuant to the General Allotment Act of 1887, 25 U.S.C. §§ 331-357, have an ownership interest in land within the boundaries of the Navajo Nation.  See Complaint ¶ 1, at 2.  In Indian law, allotment is a term of art which means a parcel of fixed land, taken from a larger, common parcel, granted to an individual.  See Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 142 (1972).

Shii Shi Keyah Allottees Association ("Association") is an organization composed of 2,500 to 3,000 individual Indian allottees and landowners in the Four Corners Region.[4]  See Complaint

---

[3] In the Motion to Strike Special Master Report (Exhibit A) from Plaintiffs' Complaint, El Paso Corp. advised that its proper name is El Paso Natural Gas Company and that the Plaintiffs will be amending the Complaint to include the entity's proper name.  See Doc. 52 n. 2 at 1.

[4] The "Four Corners Region" is the geographical area near the point where the states of Colorado, New Mexico, Arizona and Utah meet.

¶ 10, at 3.  The Association represents the interests of Navajo allottees.  See Complaint ¶ 10, at 3.

The Association is a party only with respect to Count I of the Complaint and represents the interests

of the allottee with regard to matters relating to rights-of-way for natural resources and utilities.  See

Plaintiffs' Response to Motions to Dismiss and Strike at 38-39, filed September 9, 2009

(Doc. 62)("Plaintiffs' Response").

Defendants are comprised of the following:

(i)     Defendant Public Service Company of New Mexico ("PNM"), a wholly-owned subsidiary of PNM Resources, Inc., is organized under the laws of the State of New Mexico and has its principal place of business in Albuquerque, New Mexico.  See Complaint ¶ 11, at 3.

(ii)    Defendant New Mexico Gas Company ("NMGC") is a subsidiary of Continental Energy Systems LLC, is organized under the laws of the State of New Mexico, and has a principal place of business in Albuquerque, New Mexico.  See id. ¶ 12, at 3.

(iii)   Defendant El Paso Corporation is a Delaware corporation with its principal place of business in Houston, Texas.  See id. ¶ 13, at 4.  The Court refers to El Paso Corporation and its subsidiary, El Paso Natural Gas Company, collectively as "El Paso Natural Gas."

(iv)    Defendant Enterprise Products Partners L.P. ("Enterprise") is a publicly traded Delaware limited partnership with its principal place of business in Houston, Texas.  See id. ¶ 14, at 4.

(v)     Defendant Kinder Morgan is a group of entities comprised of Kinder Morgan Energy Partners, L.P., a publicly traded Delaware limited partnership, with its principal place of business in Lakewood, Colorado; Kinder Morgan Management, LLC, a publicly traded Delaware limited liability company with its principal place of business in Houston, Texas; and Knight Inc., a Delaware corporation with its principal place of business in Houston, Texas.  See id. ¶ 15, at 4.

(vi)    Defendant Transwestern Pipeline Co., LLC ("Transwestern") is a Delaware limited liability company with its principal place of business in Houston, Texas.  See id. ¶ 16, at 4.

(vii)   Defendant Tucson Electric Power Company ("Tucson Electric") is a wholly owned subsidiary of Unisource Energy Corporation, is organized under the laws of the State of Arizona and has its principal place of business in Tucson, Arizona.  See Complaint ¶ 17, at 4-5.

(viii)  Defendant Western Refining, Inc ("Western Refining") is a publicly traded Delaware corporation organized under the laws of the State of Delaware, with its principal place of business

in El Paso, Texas.  See id. ¶ 18, at 5.[5]

      (ix)    Defendant Ken Salazar is the Secretary of the Interior.  See Complaint ¶ 19, at 4.

      PNM, NMGC, El Paso Natural Gas, Enterprise, Kinder Morgan, Tucson Electric, and Western Refining are referred herein as the "Corporate Defendants."  Each of the Corporate Defendants owns rights-of-way on allotment lands in which one or more of the individual Plaintiffs own an interest.  See id. ¶ 29, at 7.  PNM owns several rights-of-way in New Mexico and has transferred some of its ownership interests in some rights-of-way to NMGC.  See id. ¶ 11, at 3.

## PROCEDURAL BACKGROUND

      On February 11, 2009, the Plaintiffs filed their Complaint for Equitable and Legal Relief asserting that the Department of Interior's Bureau of Indian Affairs ("BIA") did not fulfill its statutory obligations under 25 U.S.C. § 325 and 25 C.F.R. §§ 169.1-.28 with regard to granting rights-of-way over the land of the individual Plaintiffs and of the potential class members.  See Complaint ¶ 20, at 5.  Specifically, the Plaintiffs assert that the BIA is required to review all proposed rights-of-way on allotment land for pipelines, electrical transmission lines, and other uses. See id. ¶ 31, at 8.  The Plaintiffs also contend that the BIA is obliged to approved the proposed rights-of-way "only if they are priced at fair market value, and only after obtaining an appraisal value of the land at issue and advising the Navajo allottees regarding the appraisals to assist them in the [right-of-way] negotiations."  Id. (citing 25 C.F.R. § 169.12).  The Plaintiffs allege that the Secretary, acting through the BIA's offices, has breached his fiduciary duties by failing, and continuing to fail: (i) to obtain appraisals; (ii) to require market value as a condition for granting

---

     [5] In the Joint Motion to Dismiss, Western Refining advised that its proper name is Western Refining Pipeline Company, a New Mexico corporation, formerly known as Giant Pipeline Company, and that the Plaintiffs will be amending the Complaint to include the entity's proper name.  See Joint Motion to Dismiss at 2 n. 3 (Doc. 57).

rights-of-way on allotment land; and (iii) to advise the landowners of the appraisal information.  See Complaint ¶ 36, at 9.  The Plaintiffs assert that the United States did not, in most cases, obtain appraisals of the rights-of-way, and, therefore, did not determine the fair market value of the rights-of-way.  See id. ¶ 41-42, at 10-11.  Further, they contend, the United States did not advise the allottees of appraisal information, or assist them with negotiating the rights-of-way or in deciding whether to consent to the rights-of-way.  See id. ¶ 41-42, at 10-11.  The Plaintiffs seek declaratory and injunctive relief against the United State for breach of trust because the United States has failed, and continues to fail, to obtain appraisals, to assist and to advise Navajo allottees of appraisal information, and to insist on fair market value "as a condition for granting [rights-of-way] on" Navajo allottees' lands.  Id. ¶ 47, at 11.

The Plaintiffs also seek certification as a class of all Navajo allottees with rights-of-way on their allotments in the Checkerboard Area within the Navajo Nation.  See Complaint ¶ 48, at 11. The Checkerboard Area is the area of land within the Navajo Nation where Navajo allotment lands are intermingled with trust lands of the Navajo Nation, private lands that the Navajo Nation and individual Navajos own, land owned by non-Indians, and federal lands, in a checkerboard pattern. See id. ¶ 27, at 7.  The Association brings its claim only with regard to Count I of the Complaint. See Plaintiffs' Response at 38-39.  The individual Plaintiffs, and the class they seek to certify, ask the Court to certify Count II as a class action on behalf of all Navajo allottees with rights-of-way owned by the Corporate Defendants on their allotments in the Checkerboard Area of the Navajo Nation and to designate the Plaintiffs' counsel as class counsel.  They further ask the Court to declare that the Corporate Defendants hold, and continuously have held, the rights-of-way in constructive trust for the benefit of the allottees, and that, by maintaining their pipelines and other transmission lines on the allottees' property, the Corporate Defendants have breached that trust.

Additionally, they request the Court to declare that the Corporate Defendants have continuously committed trespass and wrongful invasion and occupation of their allotments; to cancel the outstanding rights-of-way, and to enjoin the Defendants to immediately remove their pipelines and transmission lines from the allottees' land. The Plaintiffs ask the Court to award damages, including punitive damages; to order the Corporate Defendants to pay the Plaintiffs the value of all rights-of-way from the time they received them, with interest thereon; to award disgorgement of profits, restitution, or other appropriate relief; and to award Plaintiffs costs of suit, including reasonable attorneys' fees, and all other appropriate equitable or legal relief. See Complaint ¶¶ A-H, at 14-15, and ¶¶ A-I, at 16-17.

As part of their claims, the Plaintiffs request that their counsel be designated as class counsel. See id. ¶ B, at 12. They request that a declaratory judgment be entered against the United States declaring that the practices of which the Plaintiffs complain in the Complaint are a breach of trust and violation of the fiduciary duty towards the Navajo allottees. See id. ¶ C, at 12. Additionally, they request that the Court preliminarily and permanently enjoin the United States to perform its duties under the statutes and regulations that regulate the grant of rights-of-way on trust lands; that the Court grant injunctive or other appropriate relief to prevent future renewal or awarding of rights-of-way on allottee land at below fair-market value and without an appraisal; and that the Court award the Plaintiffs their costs of suit, including reasonable attorneys' fees and other appropriate equitable or legal relief. See Complaint ¶¶ D, E and F, at 13.

On July 1, 2009, the Federal Defendants filed the Federal Defendants' Motion to Dismiss and Memorandum in Support (Doc. 44), moving the Court to dismiss Count I of the Complaint pursuant to rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The Federal Defendants assert that the Complaint contains claims that exceed the statute of limitations and that

the allottees have failed to exhaust their administrative remedies.  The Federal Defendants contend that the allottees do not have standing to pursue claim pertaining to allotments on which there are no recorded rights-of-way and that the Association lacks standing because it cannot meet the requirements necessary to be accorded "representational standing."

On July 1, 2009, the Federal Defendants filed the Federal Defendants' Motion to Strike (Doc. 45), requesting that pursuant to rule 12(f) the Court strike Exhibit A to the Complaint (the Site Visit Report) and any reference to it in the pleadings, because the report "was prepared by an officer of the court whose impartiality was called into question" and such striking "will serve to protect the public's confidence in the judicial process." Motion to Strike ¶ 8, at 4.  The Federal Defendants argue that inclusion of the report in the pleadings is prejudicial to them.  See id.¶ 9, at 4.  On July 15, 2009, the Corporate Defendants filed their Motion to Strike Special Master Report (Exhibit A) from Plaintiffs' Complaint (Doc. 52), contending that the report "is redundant, immaterial, and impertinent to this case," particularly because it was suppressed in the litigation for which it was created.  Motion to Strike Report ¶ 5, at 4.

On July 15, 2009, Transwestern filed Defendant Transwestern Pipeline Company, LLC's Motion to Dismiss Plaintiffs' Claims for Ejectment or Removal of Pipeline and for Trespass for Lack of Jurisdiction (Doc. 53), asserting that the Natural Gas Act of 1938, 15 U.S.C. §§ 717 through 717z ("NGA"), abrogates or preempts the Plaintiffs' common-law trespass claims.  See Transwestern's Motion to Dismiss at 2.  Further, it asserts that, under the NGA, FERC has exclusive jurisdiction over the dedication and abandonment of interstate natural-gas pipelines, and that the Plaintiffs' request conflicts with FERC's jurisdiction.  See Transwestern's Motion to Dismiss at 2. Transwestern argues that, accordingly, the Court is without jurisdiction to order Transwestern to abandon or to remove its pipelines which are under FERC's governance.  See id. at 2.

On July 15, 2009, El Paso Natural Gas filed its Motion to Dismiss pursuant to Rule 12(b)(6) (Doc. 54)("El Paso's First Motion to Dismiss"), asking the Court to dismiss the claim against El Paso Natural Gas under Counts II and III of the Complaint.  See El Paso's First Motion to Dismiss at 1.  El Paso Natural Gas contends that the Federal Defendants do not have an enforceable trust duty to the Plaintiffs pertaining to the approval of rights of way, and, even if they did, the Plaintiffs cannot assert claims based on "private trust law principles of transferee liability" to "a third-party grantee from the government of [rights-of-way] on allotted lands."  El Paso's First Motion to Dismiss at 3.  El Paso Natural Gas also asserts that the NGA has displaced the trespass claims.

On July 15, 2009, El Paso Natural Gas filed El Paso's Motion to Dismiss Pursuant to Rule 12(b)(1) and 12(b)(7) (Doc. 55)("El Paso's Second Motion to Dismiss"), requesting the dismissal of the Plaintiffs' claims against them in Counts II and III of the Complaint.  El Paso Natural Gas asserts that the Plaintiffs' claims are not ripe for review because the Plaintiffs have not asserted that they exhausted their administrative remedies.  See El Paso's Second Motion to Dismiss at 2.  El Paso Natural Gas further argues that, if the Court dismisses the claim against the Federal Defendants, it should also dismiss the claims against El Paso Natural Gas for inability to join an indispensable party.  See id.  El Paso Natural Gas points to deficiencies in the Yazzie allegations regarding allotment 1470, contending that Plaintiffs did not assert any facts regarding the date of the BIA's approval of the application, how the acts violated the right-of-way statutes and regulations, and whether Yazzie appeals the BIA's approval or renewal of the grant.  See El Paso's Second Motion to Dismiss at 5.

On July 15, 2009, Kinder Morgan filed its Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 56), requesting the Court to dismiss the Plaintiffs claims regarding Allotments No. 11465 and 11469 for lack of standing.

On July 15, 2009, the Corporate Defendants filed their Joint Motion to Dismiss and Memorandum in Support of Defendant Enterprise Products Partners, L.P., Kinder Morgan, Transwestern Pipeline Company, LLC, Western Refining, Inc., Public Service Company of New Mexico, New Mexico Gas Company, Inc., and Tucson Electric Power Company Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(7) (Doc. 57), contending that Plaintiffs have failed to exhaust their required administrative remedies, the action is not ripe for judicial review, the Federal Defendants' immunity was not waived, and the claims against the Federal Defendants are time-barred. See Joint Motion to Dismiss at 3. They further allege that the Court should dismiss the Complaint because the Federal Defendants are indispensable parties. See Joint Motion to Dismiss at 3.

Also on July 15, 2009, the Corporate Defendants filed their Joint Motion to Dismiss and Memorandum in Support of Defendants Enterprise Products Partners, L.P., Kinder Morgan, Transwestern Pipeline Company, LLC, Western Refining, Inc., Public Service Company of New Mexico, New Mexico Gas Company, Inc., and Tucson Electric Power Company Pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 58), asserting that the General Right of Way Act of 1948, and its implementing regulations, do not impose a trust responsibility upon the United States which gives rise to liability against the Federal Defendants. Specifically, these Defendants contend that the Right of Way Act "and its regulations do not reflect the kind of pervasive management and control that give rise to a trust duty" and, therefore, the Plaintiffs' constructive-trust claim fails. See Enterprise's Second Motion to Dismiss at 3, 22. Further, they argue that the Right of Way Act "does not evince an intent to authorize a private right of action against" the third-party grantees of the rights-of-way. See Enterprise's Second Motion to Dismiss at 3. The movants assert that, if the Plaintiffs cannot recover against the Federal Defendants, then the Plaintiffs cannot succeed on a claim against the Corporate Defendants. See id. at 3. They additionally argue that the Complaint fails to state a

claim against them for trespass because the Plaintiffs consented to the movants entering their land for the right-of-way purposes.  See Enterprises Second Motion to Dismiss at 3.  Lastly, they argue the Complaint fails under the applicable statute of limitations.  See Enterprise's Second Motion to Dismiss at 3.

On September 9, 2009, the Plaintiffs' filed their response, addressing all of the motions that the Federal Defendants and Corporate Defendants had previously filed.  The Plaintiffs assert that the Federal Defendants breached their trust responsibilities under the Indian Rights of Way Act, 25 U.S.C. §§ 323-28 and its implementing regulations, to the detriment of the class.  See Plaintiffs' Response at 12.  They argue that the Corporate Defendants benefitted from and participated in the breach by accepting the discounted rights-of-way.  See id. at 12.  They further contend that the Federal Defendants' "failure to obtain appraisals, to assist allottees in negotiating [rights-of-way] and to obtain fair market value for [rights-of-way] continues to the present."  Id. at 17.  The Plaintiffs seek declaratory and injunctive relief against the Federal Defendants to enforce the trust. See id. at 18.  The Plaintiffs also seek all legal and equitable relief available against the Corporate Defendants.  See id.

The Plaintiffs noted in their response that they cited the Indian Tucker Act, 28 U.S.C. § 1505, in their Complaint, but are not proceeding under the Act because, with regard to the Federal Defendants, they are not seeking money damages.  See Plaintiffs' Response at 18.  The Plaintiffs base the Court's jurisdiction on the federal-question jurisdiction statute, 28 U.S.C. § 1331, and the General Allotment Act, 25 U.S.C. § 345, and assert that the Federal Defendants have waived sovereign immunity under 5 U.S.C. § 702.

On October 23, 2009, the Federal Defendants filed their reply.  See Doc. 64.  On November 4, 2009, the Corporate Defendants filed their reply to their motion to strike, see Doc. 70, reiterating

-11-

the points they previously argued in their motion and contending that, in their response, the Plaintiffs never explained why the Court should allow the report to be used in this matter.  See Western Refining's Report at 1.  On November 4, 2009, the Corporate Defendants filed their reply briefs pertaining to their motions to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(7) and Fed. R. Civ. P. 12(b)(6).  See Docs. 71 and 72.

Also on November 4, 2009 Transwestern filed its reply in support of its motion to dismiss the Plaintiffs' claims for ejectment or removal of pipeline, for trespass, and for lack of jurisdiction. See Doc. 73.  On November 4, 2009, El Paso Natural Gas also filed its reply to its motion to dismiss under rule 12(b)(6), contending that the Plaintiffs do not allege that it violated any law or allege any facts upon which relief against a third party could be granted.  See Doc. 74 at 1.  On that same day, El Paso Natural Gas also filed its reply to its motion to dismiss under rule 12(b)(1) and 12(b)(7), see Doc. 75, arguing that the Plaintiffs' response fails to establish that their claim presents a ripe case or controversy under Article III of the United States Constitution, particularly arguing that the Plaintiffs have failed to exhaust their administrative remedies and the United States is an indispensable party.  See El Paso Natural Gas Reply at 1 at 15.

On December 10, 2009, the Plaintiffs filed the Plaintiffs' Motion for Leave to File Sur-Reply to Pages 11-16 of "El Paso's Reply Memorandum in Support of Motion to Dismiss Pursuant to Rule 12(b)(6)," Doc. 82, stating that El Paso Natural Gas argued for the first time in its reply brief that its activities were privileged under the Noerr-Pennington doctrine[6] and seeking leave to file a surreply addressing that argument. See Plaintiffs' Motion for Leave at 1.

---

[6] See Mine Workers v. Pennington, 381 U.S. 657, 670 (1965); E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 136 (1961).

## STANDARD FOR MOTIONS TO DISMISS UNDER RULE 12(b)(1)

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). The party invoking federal jurisdiction bears the burden of establishing its existence. See Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974). The United States Court of Appeals for the Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002), cert. denied, 538 U.S. 999 (2003). These two forms of attack differ.

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true. See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir.), cert. denied, 454 U.S. 897 (1981). But when the attack is factual, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 [summary-judgment] motion.

Alto Eldorado Partners v. City of Santa Fe, No. CIV 08-0175 JB/ACT, 2009 WL 1312856, at **8-9 (D.N.M. Mar. 11, 2009)(Browning, J.)(citations omitted). As the United States Court of Appeals for the Fifth Circuit stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d at 412-13 (quoting Mortenson v. First Fed. Sav. & Loan Ass'n., 549 F.2d 884, 891 (3d Cir. 1977)).

## STANDARD FOR MOTIONS TO DISMISS UNDER 12(b)(6)

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991).

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. (internal citation omitted).  "[T]he Supreme Court [of the United States] recently . . . prescribed a new inquiry for us to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).  "The [Supreme] Court explained that a plaintiff must 'nudge his claims across the line from conceivable to plausible' in order to survive a motion to dismiss." Id. (alterations omitted).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable

likelihood of mustering factual support for these claims." Ridge at Red Hawk, L.L.C. v. Schneider,

493 F.3d at 1177 (emphasis in original).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct, much
> of it innocent, then the plaintiffs "have not nudged their claims across the line from
> conceivable to plausible."  The allegations must be enough that, if assumed to be
> true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly,

550 U.S. at 570)(internal citations omitted).

The Supreme Court has recently expounded upon the meaning of Bell Atlantic Corp. v.

Twombly.

> Two working principles underlie [the] decision in Twombly.  First, the tenet that a
> court must accept as true all of the allegations contained in a complaint is
> inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of
> action, supported by mere conclusory statements, do not suffice. . . .  Second, only
> a complaint that states a plausible claim for relief survives a motion to dismiss.
> Determining whether a complaint states a plausible claim for relief will . . . be a
> context-specific task that requires the reviewing court to draw on its judicial
> experience and common sense.

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009)(citation omitted).  Additionally, the Supreme

Court has commented:

> In keeping with these principles a court considering a motion to dismiss can choose
> to begin by identifying pleadings that, because they are no more than conclusions,
> are not entitled to the assumption of truth.  While legal conclusions can provide the
> framework of a complaint, they must be supported by factual allegations.

Id. at 1950.

### STANDARD FOR MOTIONS TO DISMISS UNDER 12(b)(7)

Under rule 12(b)(7), the court may dismiss a case for failure to join a necessary and

indispensable party under rule 19.  The Court exercises discretion in deciding a rule 12(b)(7) motion.

See Citizen Band Potawatomi Indian Tribe of Okla. v. Collier, 17 F.3d 1292, 1293 (10th Cir.

-15-

1994)(citing <u>Navajo Tribe of Indians v. New Mexico</u>, 809 F.2d 1455, 1471 (10th Cir. 1987)).  The

movant bears the burden to produce evidence which shows the nature of the interest, possessed by

an absent party, that such party's absence will impair the protection of that interest, and that,

accordingly, the claims should be dismissed.  See <u>Citizen Band Potawatomi Indian Tribe v. Collier</u>,

17 F.3d at 1293.  Defendants can satisfy this burden with "affidavits of persons having knowledge

of the interest as well as other relevant extra-pleading evidence."  <u>Id.</u> (quoting <u>Martin v. Local 147,</u>

<u>Int'l Bro. of Painters</u>, 775 F. Supp. 235, 236-37 (N.D. Ill. 1991)).

       In deciding whether a person is indispensable under rule 19(b), the Court applies a three-part

analysis.  See <u>Citizen Potawatomi Nation v. Norton</u>, 248 F.3d 993, 997 (10th Cir. 2001).  First, the

Court determines, under rule 19(a), whether the party is a required or "necessary" party.  A party

is required if the party can be served with process, its joinder will not deprive the court of subject-

matter jurisdiction, and:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a).  If a person is required, but has not been joined, the court must determine

whether joinder is feasible.  See <u>Citizen Potawatomi Nation v. Norton</u>, 248 F.3d at 997.  If the party

is required but cannot be joined, the Court must then determine under rule 19(b) whether the party

is indispensable.  To conclude that a party is indispensable, the Court must find "in equity and good

conscience" that the action should not proceed in the party's absence.  Fed. R. Civ. P. 19(b).  See

Sac & Fox Nation of Mo. v. Norton, 240 F.3d 1250, 1259 (10th Cir. 2001).  In making this determination, the Court, using its discretion, balances the following factors:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
>> (A) protective provisions in the judgment;
>>
>> (B) shaping the relief; or
>>
>> (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).  See Thunder Basin Coal Co. v. Sw. Pub. Serv. Co., 104 F.3d 1205, 1211 (10th Cir. 1997).

Earlier case law generally describes those parties who should be joined under rule 19(a) as necessary parties, and those necessary parties whose absence requires that a case be dismissed under rule 19(b) as indispensable parties, or necessary and indispensable parties.  The 2007 amendments to the rules changed the term necessary parties to required parties.  These amendments were stylistic only, however, and much of the case law interpreting rule 19 predates the amendments and refers to necessary and indispensable parties.

> **1.      Incomplete Relief.**

One basis on which a party may be a required, or necessary, party is if, "in that person's absence, the court cannot accord complete relief among existing parties."  Fed. R. Civ. P. 19(a)(1)(A).  A court is able to afford complete relief when a party's absence "does not prevent the plaintiffs from receiving their requested . . . relief."  Sac & Fox Nation of Missouri v. Norton, 240

F.3d 1250, 1258 (10th Cir. 2001).  As Moore's Federal Practice explains, this provision "requires joinder when nonjoinder precludes the court from effecting relief not in some overall sense, but between *extant parties*."  4 J. Moore & R. Freer, Moore's Federal Practice § 19.03[2][b], at 19-39 (3d ed. 2009)(emphasis in original).  "Properly interpreted, the Rule is not invoked simply because some absentee may cause future litigation. . . .  The fact that the absentee might later frustrate the outcome of the litigation does not by itself make the absentee necessary for complete relief."  4 Moore's Federal Practice § 19.03[2][b], at 19-39 to 19-41 (footnotes omitted).

Those cases discussing the complete-relief segment of rule 19(a) look at whether a plaintiff or other claimant can be granted complete relief without adding parties.  For example, in Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d 1081 (10th Cir. 2003), the Tenth Circuit analyzed whether the district court could grant the plaintiff all the relief that it was seeking on its claims.  See id. at 1097.  In Associated Dry Goods Corp. v. Towers Financial Corp., 920 F.2d 1121 (2d Cir. 1990), the United States Court of Appeals for the Second Circuit held that an absent party was a necessary party to afford a counterclaimant complete relief because the counterdefendant could not comply with the injunction that the counterclaimant sought without the consent of the absent party.  See id. at 1124.  In Champagne v. City of Kansas City, Kan., 157 F.R.D. 66 (D. Kan. 1994), a number of paramedics filed suit against Kansas City, alleging overtime-pay violations.  The City sought to join as plaintiffs other paramedics who had not sued.  See id. at 67.  The district court held:

> Complete relief refers to relief as between the persons already parties to the action and not as between a present party and the absent party whose joinder is sought.  The named plaintiffs in the present action would be able to obtain all the relief requested without the joinder of four additional paramedics.  Defendant's assertion that all persons whose claims are identical to the plaintiffs should be joined is not within the meaning of complete relief.

Champagne v. City of Kansas City, Kan., 157 F.R.D. at 67 (citation omitted).

2.        **Inconsistent Obligations.**

Another way in which a party can be a required or necessary party is if the "person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1)(B) and 19(a)(1)(B)(ii).  Preventing inconsistent obligations does not curtail future litigation.

> "Inconsistent obligations" are not . . . the same as inconsistent adjudications or results.  Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident. Inconsistent adjudications or results, by contrast, occur when a defendant successfully defends a claim in one forum, yet loses on another claim arising from the same incident in another forum. Unlike a risk of inconsistent obligations, a risk that a defendant who has successfully defended against a party may be found liable to another party in a subsequent action arising from the same incident -- i.e., a risk of inconsistent adjudications or results -- does not necessitate joinder of all of the parties into one action pursuant to Fed. R. Civ. P. 19(a).

Delgado v. Plaza Las Americas, Inc., 139 F.3d 1, 3 (1st Cir. 1998)(citations omitted).  While the Tenth Circuit has not devoted extended discussion to inconsistent obligations, it has given, as an example of inconsistent obligations, a hypothetical scenario in which a federal district court orders a defendant to transfer stock to the plaintiff while a state court orders the same defendant to transfer the same stock to a different party who is not involved in the federal litigation. See Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d at 1098.

The application of rule 19 is subject to rule 23.  See Fed. R. Civ. P. 19(d).

## RULE 23

Under rule 23(a), a class action may be maintained only if:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). To have a class action, the class must also satisfy one of the provisions of rule 23(b). See Dixon v. Valdez, 167 F.R.D. 688, 690 (D.N.M. 1996)(Black, J.)(quoting Sollenbarger v. Mountain States Tel. & Tel. Co., 121 F.R.D. 417, 423 (D.N.M. 1988)). Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims. See Fed R. Civ. P. 23(a)(3). The typicality requirement ensures that absent class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest. See Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994); Nicodemus v. Union Pac. Corp., 204 F.R.D. 479, 490 (D. Wyo. 2001). The essential characteristics of the named plaintiffs' claims must be the same as or similar to the class' claims, but they need not be identical; the Tenth Circuit has affirmed that factual differences among some of the class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988). "[T]here may be varying fact situations among individual members of the class and this is all right so long as the claims of the plaintiffs and the other class members are based on the same legal or remedial theory." Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975). Accordingly, differences in the amount of damages will not defeat typicality. See Harrington v. City of Albuquerque, 222 F.R.D. 505, 511 (D.N.M. 2004)(Hansen, J.).

To protect the due-process interests of unnamed class members -- who are bound by any judgment in the action -- rule 23(a)(4) requires that the named representative provide fair and adequate protection for the class' interests. See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 379 n.5 (1996)(characterizing adequacy of representation as a constitutional requirement); Lile v. Simmons, 143 F. Supp. 2d 1267, 1277 (D. Kan. 2001)("Due process requires that the Court

'stringently' apply the competent representation requirement because class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings.").   The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other class members; and (ii) whether the named plaintiffs and their counsel vigorously prosecute the action on behalf of the class.   See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002).   In considering this second question, the experience and competence of the attorney representing the class may inform the court's analysis.   See Lopez v. City of Santa Fe, 206 F.R.D. 285, 289-90 (D.N.M. 2002)(Vazquez, J.).

## STANDARDS FOR MOTIONS TO STRIKE UNDER RULE 12(f)

A court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Hill v. Cray Research, Inc., 864 F. Supp. 1070, 1073 (D.N.M. 1991). See Ysais v. N.M. Judicial Standard Comm'n, 616 F. Supp. 2d 1176, 1184 (D.N.M. 2009)(Browning, J.); Leviton Mfg. Co., Inc. v. Zhejiang Dongzheng Elec. Co., No. CIV 05-0301, 2006 WL 4060663, at *1 (D.N.M. Sept. 18, 2006)(Browning, J.); Fed. R. Civ. P. 12(f).   "Motions to strike, however, are generally a disfavored and drastic remedy." Sierra Club v. Tri-State Generation & Transmission Ass'n, Inc., 173 F.R.D. 275, 285 (D. Colo. 1997).   "To be impertinent or immaterial, the allegations must have no possible bearing on the controversy." Employers Ins. of Wausau v. Musick, Peeler, & Garrett, 871 F. Supp. 381, 391 (S.D. Cal. 1994).   Evidentiary allegations are not usually proper pleading, but allegations supplying background or historical material or other matter of an evidentiary nature will not be stricken unless unduly prejudicial to defendant. See Fuchs Sugar & Syrups, Inc. v. Amstar Corp., 402 F. Supp. 636, 637-38 (S.D.N.Y. 1975).   Irrelevant allegations will be stricken as scandalous only if they degrade defendants' moral character, contain repulsive

language, or detract from the dignity of the court.  See Nault's Auto. Sales v. Am. Honda Motor Co.,

148 F.R.D. 25, 30 (D.N.H. 1993)(citation omitted).  Relevant allegations will be stricken as

scandalous only if they satisfy the above criteria and go into unnecessary detail.  See id.  Motions

to strike are granted or denied in the court's discretion.  See The Wilderness Soc'y v. Kane County,

Utah, 581 F.3d 1198, 1226, n.25 (10th Cir. 2009).

## LAW REGARDING STANDING

A federal court may hear cases only where the plaintiff has standing to sue.  Standing has

two components.  First, standing has a constitutional component arising from Article III's

requirement that federal courts hear only genuine cases or controversies.  Second, standing has a

prudential component.  See Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1224 n.7 (10th

Cir. 2008)(noting that, in addition to constitutional standing requirements, "the Supreme Court

recognizes a set of 'prudential' standing concerns that may prevent judicial resolution of a case even

where constitutional standing exists").  The burden of establishing standing rests on the plaintiffs.

See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).  The plaintiffs must

"allege . . . facts essential to show jurisdiction.  If they fail to make the necessary allegations, they

have no standing."  FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(internal citations and

quotations omitted).  Moreover, where the defendant challenges standing, a court must presume lack

of jurisdiction "unless the contrary appears affirmatively from the record."  Renne v. Geary, 501

U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area School Dist., 475 U.S. 534, 546 (1986)

(internal quotation omitted).  "It is a long-settled principle that standing cannot be inferred

argumentatively from averments in the pleadings but rather must affirmatively appear in the record."

Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting FW/PBS v. City of Dallas, 493

U.S. at 231)(internal citations and quotations omitted).

1.      __Article III Standing__.

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  San Juan County, Utah v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007).  See U.S. Const. art. III, § 2.  "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'"  Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)(quoting Massachusetts v. EPA, 549 U.S. 497 (2007))(brackets in Wyoming ex rel. Crank v. United States, further internal quotation marks omitted).  "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing."  San Juan County, Utah v. United States, 503 F.3d at 1171.  To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision."  Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(internal quotation marks omitted).

"Standing is determined as of the time the action is brought."  Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)).  In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law.  The Tenth Circuit noted that the plaintiff had recently taken his state appeal, and therefore was in no position to challenge the adequacy of state appellate review in cases

culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

Id., 484 F.3d at 1285.

By contrast, in Nova Health Sys. v. Gandy, the Tenth Circuit found that abortion providers had standing to challenge a recently enacted Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law. Although finding standing, the Tenth Circuit was careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova faced any imminent likelihood that it would lose some minor patients seeking abortions. 416 F.3d at 1155. Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing. See id.

## 2.    Prudential Standing.

"Prudential standing is not jurisdictional in the same sense as Article III standing." Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007). Prudential standing consists of "a judicially-created set of principles that, like constitutional standing, places limits on the class of persons who may invoke the courts' decisional and remedial powers." Bd. of County Comm'rs of Sweetwater County v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(internal quotation marks omitted). Generally, there are three prudential-standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties;" (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens;" and (iii) "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Id. (internal quotation marks

and citations omitted).

Most relevant here is the rule that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Aid for Women v. Foulston, 441 F.3d 1101, 1111 (10th Cir. 2006)(quoting Warth v. Seldin, 422 U.S. 490, 499(1975)). There is an exception to this general rule, however, known as third-party standing or jus tertii. Third-party standing is allowed when: (i) "the party asserting the right has a close relationship with the person who possesses the right;" and (ii) "there is a hindrance to the possessor's ability to protect his own interests." Aid for Women v. Foulston, 441 F.3d at 1111-12.

To have standing to seek judicial review of agency's administrative actions, a plaintiff must demonstrate that he or she has suffered an injury in fact, and that his or her interest is arguably within the zone of interests intended to be protected by the relevant statute. Corrugated Container Corp. v. Community Services Administration, 429 F. Supp. 142, 150 (W.D. Va. 1977). Additionally, it must be obvious 'that relevant statutes neither preclude judicial review nor commit action in question solely to agency's discretion." Id.

With regard to a class action, courts have held that, if any single plaintiff has standing, the court has jurisdiction over the case and need not consider whether any other plaintiff has standing as well. See Watt v. Energy Action Educ. Found., 454 U.S. 151, 160 (1981); Mountain States Legal Foundation v. Glickman, 92 F.3d 1228, 1232 (D.C. Cir. 1996). Plaintiffs suing under the Administrative Procedures Act ("APA") must also establish that they are "adversely affected or aggrieved . . . within the meaning of a relevant statute" by some final agency action. 5 U.S.C. § 702. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882 (1990). Plaintiffs must establish standing as a prerequisite for declaratory relief. See Rector v. City & County of Denver, 348 F.3d 935, 946 (10th Cir. 2003)(affirming dismissal of request for declaration that city ordinance is

unconstitutional, on the basis that "the abstract possibility that Plaintiffs may receive a contestable parking ticket in the future certainly does not satisfy Article III's requirements.").  As to injunctive relief, plaintiffs must demonstrate a "personal stake in the outcome."  F.E.R. v. Valdez, 58 F.3d 1530, 1534 (10th Cir. 1995).  Plaintiffs must demonstrate a sufficient likelihood that they will be harmed in the future by the allegedly illegal conduct.  Id.

### LAW REGARDING ASSOCIATION STANDING

An organization may represent its members' interests provided it can establish that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977); Am. Forest & Paper Ass'n v. EPA, 154 F.3d 1155, 1158-59 (10th Cir. 1998).  An association, representing a class, must meet a similar test for standing as individuals do.

### 1.    Injury in Fact.

To meet the test's first prong, "the association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."  Warth v. Seldin, 422 U.S. at 511.  Further, the Supreme Court requires allegations of "specific, concrete facts demonstrating that the challenged practices harm [plaintiffs] and that [plaintiffs] personally would benefit in a tangible way from the court's intervention."  Id. at 508 (emphasis added).

### 2.    Causation.

"The issue in the causation inquiry is whether the alleged injury can be traced to the defendant's challenged conduct, rather than to that of some other actor not before the court."

Ecology Rights Found. v. Pacific Lumber, 230 F.3d 1141, 1151 (9th Cir. 2000)(citing Lujan v.

Defenders of Wildlife, 504 U.S. at 560)). The Tenth Circuit has distinguished between the injury-in-

fact requirement and the causation requirement:

> Whether an increased risk will or will not occur due to the agency action determines
> whether a plaintiff has suffered injury in fact, not causation. . . . [T]he risk must be
> actual, threatened or imminent. However, once the plaintiff has established the
> likelihood of the increased risk for purposes of injury in fact, to establish causation
> . . . the plaintiff need only trace the risk of harm to the agency's alleged failure to
> follow the [law].

Comm. to Save the Rio Hondo v. Lucero, 102 F.3d 445, 451-52 (10th Cir. 1996). The relevant

showing for purposes of Article III standing, is injury to the plaintiff. See Friends of the Earth, Inc.

v. Laidlaw Env. Services (TOC), Inc., 528 U.S. 167, 181 (2000).

**3.      Redressability.**

To establish redressability, "a plaintiff must . . . establish it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision." Comm. to Save the Rio

Hondo v. Lucero, 102 F.3d at 452. A plaintiff seeking injunctive relief satisfies the redressability

requirement "by alleging a continuing violation or the imminence of a future violation of an

applicable statute or standard." NRDC v. Sw. Marine, 236 F.3d 985, 995 (9th Cir. 2000).

For purposes of a standing analysis, however, the court assumes that the alleged legal

violations have occurred and asks whether a favorable decision in the case will redress the injury

that the plaintiffs have alleged. See Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 452. To

satisfy redressability, the plaintiff need show only "the likelihood (as opposed to speculation [or

certainty]) that the injury be redressed by a favorable decision." Sw. Ctr. for Biological

Diversity v. Clark, 90 F. Supp. 2d 1300, 1310 (D.N.M. 1999)(Mecham, Senior Judge). Where the

plaintiff has established that the challenged action causes him or her an ongoing injury in fact, then

an order invalidating and enjoining further engagement in the challenged action will redress the injury. See Friends of the Earth, Inc. v. Laidlaw Env. Services (TOC), Inc., 528 U.S. at 185-186.

    **4.**    **Germane to Its Purpose**.

The final element for the association to show is that the interests it seeks to protect are germane to the association's purpose. See id. at 181. Merriam-Webster Online defines germane as (i) "closely akin" and (ii) "being at once relevant and appropriate."http://www.merriam-webster.com/dictionary/germane.

Sometime standing is confused with ripeness. Standing and ripeness are closely related doctrines "in that each focuses on whether the harm asserted has matured sufficiently to warrant judicial intervention." Skull Valley Band of Goshute Indians v. Nielson, 376 F.3d 1223, 1234 (10th Cir. 2004)(quoting Johnson v. Missouri, 142 F.3d 1087, 1090 n.4 (8th Cir. 1998)). The difference between the two is that standing concerns who may bring an action while ripeness concerns when the action may be brought. See ACORN v. City of Tulsa, Okla., 835 F.2d 735, 738 (10th Cir. 1987).

## LAW REGARDING RIPENESS

"The question of ripeness, like other challenges to a court's subject matter jurisdiction, is treated as a motion under Rule 12(b)(1)." New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995). See Fed. R. Civ. P. 12(b)(1). "In order for a claim to be justiciable under Article III, it must be shown to be a ripe controversy." New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995). Ripeness pertains to timing of a case and is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995)(quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967)). Ripeness is a component of the Article III requirement that limits judicial review to "cases or controversies."

U.S. Const. art. III, § 2.  See U.S. West, Inc. v. Tristani, 182 F.3d 1202, 1208 (10th Cir. 1999).  To

satisfy Article III's case-or-controversy requirement, a claim must present an impending "injury in

fact."  Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1996).

To satisfy the injury in fact requirement, "a plaintiff must 'allege concrete plans rather than mere

'some day intentions.'"  Verizon Wireless (VAW) v. City of Rio Rancho, NM, 476 F. Supp. 2d

1325, 1332 (D.N.M. 2007)(quoting Roe #2 v. Ogden, 253 F.3d 1225, 1229 (10th Cir. 2001)).

> In determining whether an issue is fit for judicial review, the central focus is on
> "whether the case involves uncertain or contingent future events that may not occur
> as anticipated, or indeed may not occur at all."  13A Wright, Miller & Cooper,
> Federal Practice & Procedure, § 3532 at 112.  To this end, courts frequently focus
> on whether a challenged government action is final and whether determination of the
> merits turns upon strictly legal issues or requires facts that may not yet be
> sufficiently developed.  See Sierra Club [v. Yuetter], 911 F.2d [1405,] 1415 [(10th
> Cir. 2005)]; El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 495 (1st Cir. 1992).  In
> assessing the hardship to the parties of withholding judicial resolution, our inquiry
> "'typically turns upon whether the challenged action creates a "direct and
> immediate" dilemma for the parties.'"  El Dia, Inc. v. Hernandez Colon, 963 F.2d at
> 495 (quoting W.R. Grace & Co. v. United States EPA, 959 F.2d 360, 364 (1st Cir.
> 1992)).

New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995).  Fitness of the

issue for judicial resolution involves both whether the issue is purely legal and whether the agency

action is final.  See Abbott Labs. v. Gardner, 387 U.S. 136, 149-52 (1967).  The other prong of the

ripeness test is the hardship to the parties of withholding judicial review.  See id.  This prong is

concerned with "whether the challenged action creates a direct and immediate dilemma for the

parties."  See, e.g., New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir.

1995)(citing El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 495 (1st Cir. 1992)(internal quotation

marks omitted)).  Harm includes "the heightened uncertainty and resulting behavior modification

that may result from delayed resolution," as well as traditional types of harm recognized by the

courts.  See Neb. Pub. Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1038 (8th Cir.

2000)(citing Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733-34 (1998)).  "[T]o resolve an issue lacking factual development simply to avoid a threatened harm would be to favor expedition over just resolution."  Neb. Pub. Power Dist. V. MidAmerican Energy Co., 234 F.3d at 1039.  Premature resolution would also run afoul of the "fundamental and long-standing principle of judicial restraint [which] requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."  See Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988).

## SOVEREIGN IMMUNITY

The federal government and its agencies may be sued only if it has waived its sovereign immunity.  See Dahl v. United States, 319 F.3d 1226, 1228 (10th Cir. 2003).  "Sovereign immunity is not waived by general jurisdictional statutes such as 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1340 (jurisdiction over actions arising under the Internal Revenue Code), and 28 U.S.C. § 1361 (action to compel a government officer to perform his duty)."  Lonsdale v. United States, 919 F.2d 1440, 1444 (10th Cir. 1990).  The waiver must be unequivocally expressed and not liberally construed; consent is strictly construed in favor of the federal government.  See United States v. Nordic Village, Inc., 503 U.S. 30, 33-34 (1992).  When the acts complained of by the plaintiff pertain to actions of defendants in their official capacity as agents of the United States, the claim is, in actuality, against the United States.  See Atkinson v. O'Neill, 867 F.2d 589, 590 (10th Cir. 1989)(citing Burgos v. Milton, 709 F.2d 1, 2 (1st Cir. 1983).

## ADMINISTRATIVE PROCEDURES ACT

The APA confers jurisdiction on federal district courts with respect to non-monetary claims. See Castella v. Army & Air Force Exch. Serv., 657 F. Supp. 25, 27 (N.D. Tex. 1986).  Specifically, 5 U.S.C. § 702 provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

The APA does not, through § 702, create an independent basis of jurisdiction, see Eagle-Picher Indus., Inc. v. United States, 901 F.2d 1530, 1531 (10th Cir. 1990); it allows for judicial review of final agency action only if there is also an independent basis for subject-matter jurisdiction, see Colo. Dep't of Soc. Servs. v. Dep't of Health & Human Servs., 558 F. Supp. 337, 339 (D. Colo. 1983). Notably, before review of the grievance may occur, the party must demonstrate that statutes do not preclude judicial review and that the action is not committed to agency discretion by law. See Heckler v. Chaney, 470 U.S. 821, 828 (1985).

## RELEVANT LAW REGARDING EXHAUSTION OF ADMINISTRATIVE REMEDIES

"The doctrine of exhaustion of administrative remedies is one among related doctrines -- including abstention, finality, and ripeness -- that govern the timing of federal-court decisionmaking." McCarthy v. Madigan, 503 U.S. 140, 144 (1992), superceded by statute on other grounds as recognized in Garrett v. Hawk, 127 F.3d 1263, 1265 (10th Cir. 1997). A court conducting an exhaustion inquiry must give "paramount importance" to congressional intent. McCarthy v. Madigan, 503 U.S. at 144 (quoting Patsy v. Bd. of Regents of Fla., 457 U.S. 496, 501 (1982)). Where Congress provides that certain administrative remedies are exclusive, exhaustion

is required.  See Patsy v. Bd. of Regents of Fla., 457 U.S. at 502 n.4 (citing Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 (1938)).  Moreover, even where there is no explicit statutory exhaustion requirement, courts must draw guidance from congressional intent "in determining whether application of the doctrine would be consistent with the statutory scheme."  Patsy v. Bd. of Regents of Fla., 457 U.S. at 502 n.4.  Thus, in deciding whether exhaustion of federal remedies is required, "courts generally focus on the role Congress has assigned to the relevant federal agency, and tailor the exhaustion rule to fit the particular administrative scheme created by Congress."  Id. (citing McKart v. United States, 395 U.S. 185, 193-95 (1969)).

The Supreme Court has recognized at least three broad exceptions to the exhaustion requirement: (i) "First, requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action," McCarthy v. Madigan, 503 U.S. at 146-47; (ii) "Second, an administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief,'" id. at 147 (quoting Gibson v. Berryhill, 411 U.S. 564, 575, n.14 (1973)); and (iii) "Third, an administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it," McCarthy v. Madigan, 503 U.S. at 147.  Not only does a party's failure to exhaust mandatory administrative remedies bar the court from hearing that party's claim, but it also prevents the court from treating that party as a class member in a class action claim.  See Arctic Slope Native Ass'n v. Sebelius, 583 F.3d 785, 796 (Fed. Cir. 2009).

### STATUTES OF LIMITATIONS

Pursuant to 28 U.S.C. § 2401(a), with few exceptions, "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  Civil actions include legal claims, equitable claims, and mixed claims.  See

Spannaus v. Dep't of Justice, 824 F.2d 52, 55 (D.C. Cir. 1987). This general six-year statute of limitations, unlike an ordinary statute of limitation, "is a jurisdictional condition attached to the government's waiver of sovereign immunity." Ctr. for Biological Diversity v. Hamilton, 453 F.3d 1331, 1334 (11th Cir. 2006)(quoting Spannaus v. Dep't of Justice, 824 F.2d at 55); 14 C. Wright, A. Miller, & E. Cooper, Fed. Prac. & Proc. § 3654, at 194-99 (3d ed. 1985)("[A]n action against the government may be brought only in the particular court designated in the consent statute and within the time limits set out in the applicable statute, which means that a statute of limitations defense cannot be waived by the government[.]")(footnotes omitted).[7] Because of the United States' sovereign immunity and because the United States may be sued only upon express congressional authorization, statutes of limitations and other limitations and conditions upon authorizations to sue are strictly construed; exceptions are not implied. See Thompson v. Dugan, 427 F. Supp. 342, 344 (E.D. Pa. 1977). This six-year statute of limitations has been applied in civil actions against the United States brought by members of an Indian tribe under provisions of the General Allotment Act. See Christensen v. United States, 755 F.2d 705, 707-08 (9th Cir. 1985) (holding that the six-year statute of limitations barred an action seeking monetary and injunctive relief against United States based on BIA's failure to provide access to Indian land allotment). When a claim by Indians to

---

[7] In the not-too-distant past, the Supreme Court found that many statutes of limitations against the United States are subject to equitable tolling. See Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 95-96 (1990). That holding might appear to call into question whether those statutes of limitations are jurisdictional. Since Irwin v. Department of Veterans Affairs, however, the Supreme Court has held such statutes of limitations to be jurisdictional. See United States v. Williams, 514 U.S. 527, 534 n.7 (1995)("As a statute of limitations, [26 U.S.C.] § 6511 does narrow the waiver of sovereign immunity in § 1346(a)(1) by barring the tardy. . . ."). See also Henderson v. United States, 517 U.S. 654, 678 n.3 (1996)(Thomas, J., dissenting)("Irwin did mark a departure from our earlier, and stricter, treatment of statutes of limitations in the sovereign immunity context, but our decision in United States v. Williams, 514 U.S. [at 534 n.7] (1995), makes clear that statutes of limitations in suits brought against the United States are no less jurisdictional prerequisites than they were before Irwin.").

enforce property rights is based on federal common law, however, there is no applicable federal

statute of limitations. <u>See</u> <u>Oneida County, N.Y. v. Oneida Indian Nation of New York State</u>, 470

U.S. 226, 240 (1985).

A statute of limitations commences when "[a] plaintiff has reason to know of his injury when

he should have discovered it through the exercise of reasonable diligence." <u>Indus. Constructors</u>

<u>Corp. v. U.S. Bureau of Reclamation</u>, 15 F.3d 963, 969 (10th Cir. 1994). "A plaintiff need not know

the full extent of his injuries before the statute of limitations begins to run." <u>Id.</u> Under New Mexico

law, the statute of limitations for claims based on accounts, unwritten contract, injuries to and

conversion of property, fraud, and other actions is four years. <u>See</u> NMSA 1978, § 37-1-4. The

statute of limitations begins to run on the date on which the plaintiff discovered or reasonably should

have discover the trespass. <u>See</u> <u>id</u>.

## <u>LAW REGARDING PREEMPTION</u>

Article VI, Clause 2, of the Constitution provides that the laws of the United States "shall

be the Supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the

Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Consistent with the Supremacy Clause, the

Supreme Court has "long recognized that state laws that conflict with federal law are 'without

effect.'" <u>Altria Group, Inc. v. Good</u>, 129 S. Ct. 538, 543 (2008)(quoting <u>Maryland v. Louisiana</u>, 451

U.S. 725, 746 (1981)). The Supreme Court has summarized the situations in which preemption is

likely to be found:

> Pre-emption may be either expressed or implied, and is compelled whether
> Congress' command is explicitly stated in the statute's language or implicitly
> contained in its structure and purpose. Absent explicit pre-emptive language, we
> have recognized at least two types of implied pre-emption: field pre-emption, where
> the scheme of federal regulation is so pervasive as to make reasonable the inference
> that Congress left no room for the States to supplement it, and conflict pre-emption,
> where compliance with both federal and state regulations is a physical impossibility,

or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. 88, 98 (1992) (citations omitted).

Preemption may be express or implied.  See id.  When faced with express preemption -- where a statute expressly states that it preempts certain areas of state law -- a court must determine the scope of the preemption that Congress intended.  See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)(stating that "the purpose of Congress is the ultimate touch-stone in every pre-emption case.").  "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose."  Altria Group, Inc. v. Good, 129 S. Ct. at 543.  When the text of a preemption clause is susceptible to more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption."  Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005).  Preemption arguments are analyzed under Rule 12(b)(1).  See Lewis v. Donley, 2009 U.S. WL 1492139 *12 (D. Alaska 2009).

Implied conflict preemption is found when it is impossible for a private party to comply with both state and federal requirements, see English v. General Elec. Co., 496 U.S. 72, 78-79 (1990), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67 (1941).  "Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law."  Hines v. Davidowitz, 312 U.S. at 67 (citing Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).

The Supreme Court, in the past, found that implied preemption may take the form of

"obstacle" preemption.[8]  See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000)

(holding that preemption is appropriate where the challenged state law "stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress"); Pharm. Research

and Mfrs. of Am. v. Walsh, 538 U.S. 644, 679 (2003)(Thomas, J., concurring)("Obstacle

pre-emption turns on whether the goals of the federal statute are frustrated by the effect of the state

law.").  The Supreme Court instructed that in obstacle preemption cases, "there is no federal

pre-emption in vacuo, without a constitutional text or a federal statute to assert it."  Puerto Rico

Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503 (1988).  See Gade v. Nat'l

Solid Wastes Mgmt. Assoc., 505 U.S. at 98.  The reviewing court must still "examine the explicit

statutory language and the structure and purpose of the statute."  Ingersoll-Rand Co. v. McClendon,

498 U.S. 133, 138 (1990).  In 2000, the Supreme Court decided Geier v. American Honda Motor

Co., 529 U.S. 861 (2000), which held, by a five-to-four vote, that claims that a car was defective

because it lacked an airbag were pre-empted by a federal regulation that permitted, but did not

require, airbags to be installed in passenger vehicles.  See 529 U.S. at 874.  The majority found:

"The rule of state tort law for which petitioners argue would stand as an 'obstacle' to the

accomplishment of [the federal regulation's] objective.  And the statute foresees the application of

ordinary principles of pre-emption in cases of actual conflict. Hence, the tort action is pre-empted."

529 U.S. at 886.  Justice Stevens, in his dissenting opinion, expressed a desire to eliminate obstacle

preemption.  He argued that the presumption against preemption

> serves as a limiting principle that prevents federal judges from running amok with
> our potentially boundless (and perhaps inadequately considered) doctrine of implied
> conflict pre-emption based on frustration of purposes -- i.e., that state law is

---

[8]"Obstacle" preemption has also been referred to as the "doctrine of frustration-of-purposes."
Geier v. Am. Honda Motor Co., 529 U.S. 861, 908 n.22 (2000)(Stevens, J., dissenting).

pre-empted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Geier v. Am. Honda Motor Co., 529 U.S. at 907-08 (Stevens, J., dissenting).

The Supreme Court, however, has now begun to back away from finding implied preemption based on an alleged conflict with the purposes underlying federal regulations. In 2002, the Supreme Court issued a unanimous decision in Sprietsma v. Mercury Marine, 537 U.S. 51 (2003), rejecting implied conflict preemption of state law claims that a boat engine was defective because it lacked a propeller guard. In 2008, in Altria Group. Inc. v. Good, the Supreme Court rejected the plaintiffs' obstacle-preemption claim that Maine's Unfair Practices Act was implicitly pre-empted by a similar federal act, the Federal Cigarette Labeling and Advertising Act, because it presented an obstacle to the Federal Trade Commission. See 129 S. Ct. at 551. Most recently, in Wyeth v. Levine, 129 S. Ct. 1187 (2009), six Justices of the Supreme Court, including Justices Breyer and Kennedy, who joined in the majority decision in Geier v. American Honda Motor Co., rejected the plaintiff's two implied preemption arguments -- impossibility preemption and obstacle preemption. See Wyeth v. Levine, 129 S. Ct. at 1203 (holding that "it is not impossible for Wyeth to comply with its state and federal law obligations and that Levine's common-law claims do not stand as an obstacle to the accomplishment of Congress' purposes in the [Federal Food, Drug, and Cosmetic Act]."). In so ruling, Justice Stevens, writing for the majority, narrowly limited Geier v. American Honda Motor Co. to its facts, finding that the decision in that case was based on the "complex and extensive" history of the substantive regulation at issue. 129 S. Ct. at 1201. The Supreme Court rejected obstacle preemption, stating: "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history." Wyeth v. Levine, 129 S. Ct. at 1200. Justice Stevens quoted Justice O'Connor's

explanation in Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141 (1989): "The case for

federal pre-emption is particularly weak where Congress has indicated its awareness of the operation

of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and

to tolerate whatever tension there is between them." Wyeth v. Levine, 129 S. Ct. at 1200 (quoting

Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. at 166-67).

Of particular import for the current status of implied obstacle preemption was Justice

Thomas' concurring opinion in Wyeth v. Levine, in which he wrote:

> I write separately, however, because I cannot join the majority's implicit
> endorsement of far-reaching implied pre-emption doctrines. In particular, I have
> become increasingly skeptical of this Court's "purposes and objectives" pre-emption
> jurisprudence. Under this approach, the Court routinely invalidates state laws based
> on perceived conflicts with broad federal policy objectives, legislative history, or
> generalized notions of congressional purposes that are not embodied within the text
> of federal law. Because implied pre-emption doctrines that wander far from the
> statutory text are inconsistent with the Constitution, I concur only in the judgment.

129 S. Ct. at 1205 (Thomas, J., concurring in the judgment). Justice Thomas stressed his concern:

> Under the vague and potentially boundless doctrine of purposes and objectives
> pre-emption . . . the Court has pre-empted state law based on its interpretation of
> broad federal policy objectives, legislative history, or generalized notions of
> congressional purposes that are not contained within the text of federal law . . .
> Congressional and agency musings, however, do not satisfy the Art. I, § 7
> requirements for enactment of federal law and, therefore, do not pre-empt state law
> under the Supremacy Clause.

129 S. Ct. at 1207. Justice Thomas emphasized that, when analyzing the preemptive effect of

federal statutes or regulations, "[e]vidence of pre-emptive purpose must be sought in the text and

structure of the provision at issue" to comply with the Constitution. Id. at 1207-08 (citing CSX

Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)).

Moreover, the Supreme Court has put renewed emphasis on the presumption against

preemption. See Wyeth v. Levine, 129 S. Ct. at 1195 n.3. "In areas of traditional state regulation,

-38-

[the court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005)(internal quotation marks omitted).  If confronted with two plausible interpretations of a statute, the court has "a duty to accept the reading that disfavors pre-emption." Bates v. Dow Agrosciences LLC, 544 U.S. at 449. See Wyeth v. Levine, 129 S. Ct. at 1195: Cipollone v. Liggett Group, Inc., 505 U.S. at 518.

## LAW REGARDING ABROGATION

Where Congress has acted to invade an area of law that federal common law formerly occupied, the Court's role in lawmaking is limited.  See City of Milwaukee v. Illinois, 451 U.S. 304, 314 (1981).  "It is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law." Id. at 317.  "Where the issues raised require the expertise of administrative agencies, federal courts often decline to exercise the jurisdiction and refuse to hear the claim based on the doctrine of primary jurisdiction." Tampa Interstate 75 Ltd. P'ship v. Fla. Gas Transmission, 294 F. Supp. 2d 1277, 1279 (M.D. Fla. 2003)

## LAW REGARDING REGULATION OF NATURAL GAS COMPANIES

The NGA regulates natural-gas companies, including the transportation by them of natural gas in interstate commerce.  See 15 U.S.C. § 717(a) & (b).  Congress has declared that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest."  15 U.S.C. § 717(a).  As part of the regulation, all natural gas companies must obtain from the FERC a certificate of public convenience and necessity authorizing their operations and acts.  See 15 U.S.C. § 717f(c)(1)(A).

When Congress decided regulation of the natural gas industry was necessary, it entrusted regulation to the FERC's informed judgment, and not to the preference of the court.  See United Gas Pipeline Co. v. Fed. Energy Reg. Comm'n, 657 F.2d 790, 794 (5th Cir. 1981).  FERC has primary jurisdiction over claims for trespass and ejectment of a FERC certified pipeline.  See Tampa Interstate 75 Ltd. P'ship v. Fla. Gas Transmission, 294 F. Supp. 2d at 1279.

## LAW REGARDING FIDUCIARY AND TRUST OBLIGATIONS OF THE UNITED STATES OVER INDIAN TRUST LANDS

28 U.S.C. § 1331 grants jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States" and provides jurisdiction in some cases involving Indians and Indian tribes.   "Th[e Supreme] Court has . . . emphasized 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.'" United States v. Mitchell, 463 U.S. 206, 225 (1983)(quoting Seminole Nation v. United States, 316 U.S. 286, 296 (1942)).   When the statutes and regulations delegate to the United States full responsibility to manage the Indian resources and land for the benefit of the Indians, then the fiduciary responsibility is greater and the duties may be enforced.  See United States v. Navajo Nation (Navajo I), 537 U.S. 488, 505 (2003).  "[A] fiduciary relationship necessarily arises when the Government assumes such elaborate control over forest and property belonging to the Indians.  All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds)."  United States v. Mitchell, 463 U.S. 206, 225 (1983).

> To begin with, the Indian allottees are in no position to monitor federal management of their lands on a consistent basis.  Many are poorly educated, most are absentee owners, and many do not even know the exact physical location of their allotments. Indeed, it was the very recognition of the inability of the Indians to oversee their interests that led to federal management in the first place.  A trusteeship would mean little if the beneficiaries were required to supervise the day-to-day management of

their estate by their trustee or else be precluded from recovery for mismanagement.

Id.

The Indian General Allotment Act of 1887, 24 Stat. 388, as amended, 25 U.S.C. §§ 331 through 358 (the "General Allotment Act"), was created to end the tribal and nomadic life of the Indians. . . ." Hopkins v. United States, 414 F.2d 464, 467 (9th Cir. 1969). The General Allotment Act provided for the allotment of land within Indian reservations to those Indians residing on the reservation and stated that the United States would "retain title to such allotted lands in trust for the benefit of the allottees." United States v. Mitchell, 445 U.S. 535, 540-41 (1980). 25 U.S.C. § 345 allows for actions regarding allotments, providing:

> All persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment Act or under any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any Act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto in the proper district court of the United States; . . . .

Pursuant to 25 U.S.C. § 323, the Secretary of the Interior is authorized to grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across lands held in trust by the United States for individual Indians or Indian tribes, communities, bands, or nations. The requirements for compensation for such rights-of-way is set forth in 25 U.S.C. § 325, which states in relevant part: "No grant of a right-of-way shall be made without the payment of such compensation as the Secretary of the Interior shall determine to be just." The accompanying regulations further set forth the compensation requirement for the rights-of-way.

> Except when waived in writing by the landowners or their representatives as defined in § 169.3 and approved by the Secretary, the consideration for any right-of-way granted or renewed under this Part 169 shall be not less than but not limited to the fair market value of the rights granted, plus severance damages, if any, to the remaining estate. The Secretary shall obtain and advise the landowners of the

-41-

appraisal information to assist them (the landowner or landowners) in negotiations for a right-of-way or renewal.

25 C.F.R. § 169.12.  While, generally, consent of the owner or owners of the land is required for the granting of a right of way, see 25 C.F.R. § 169.3, 25 U.S.C. § 324 sets forth the instances when consent of the owner or owners is not required.

The process and timing for appeal of the agency's decision is set forth in detail in the regulations:

> An appellant must file a written notice of appeal in the office of the official whose decision is being appealed . . . .  The notice . . . must be filed . . . within 30 days of receipt by the appellant of the notice of administrative action . . . .  The burden of proof of timely filing is on the appellant.  No extension of time shall be granted for filing a notice of appeal.  Notices of appeal not filed in the specified time shall not be considered, and the decision involved shall be considered final for the Department[.]

25 C.F.R. § 2.9(a).

> (a) Except as otherwise provided in § 1.2 of this chapter, the regulations in this Part 169 prescribe the procedures, terms and conditions under which rights-of-way over and across tribal land, individually owned land and Government owned land may be granted.

> (b) Appeals from administrative action taken under the regulations in this Part 169 shall be made in accordance with Part 2 of this chapter.

25 C.F.R. § 169.2.   An appeal process has also been created for cases in which an official fails to act upon request of an affected person or persons.  See 25 C.F.R. § 2.8(a) ("A person or persons whose interests are adversely affected, or whose ability to protect such interests is impeded by the failure of an official to act on a request to the official, can make the official's inaction the subject of appeal.").

The regulations set forth in 25 C.F.R. § 2.6 prescribe when decisions are final agency action subject to judicial review.

-42-

(a) No decision, which at the time of its rendition is subject to appeal to a superior authority in the Department, shall be considered final so as to constitute Departmental action subject to judicial review under 5 U.S.C. 704, unless when an appeal is filed, the official to whom the appeal is made determines that public safety, protection of trust resources, or other public exigency requires that the decision be made effective immediately.

Id. § 2.6(a).  See W. Shoshone Bus. Council v. Babbitt, 1 F.3d 1052, 1055 n.3 (10th Cir. 1993).

## LAW REGARDING CLAIMS AGAINST THIRD PARTIES FOR UNITED STATES' ACTION

"It is a well established principle of equity that a third party who pays money to a fiduciary for the benefit of the beneficiary, with knowledge that the fiduciary intends to misappropriate the money or otherwise be false in his trust, is a participant in the breach of trust and liable therefor [sic] to the beneficiary."  Seminole Nation v. United States, 316 U.S. at 296.  To be liable, the third person must knowingly participate in the trustee's breach.  See Mertens v. Hewitt Assocs., 508 U.S. 248 (1993).  A person who "has colluded with a fiduciary" in committing a breach of duty, and who benefits form the act, is liable to the beneficiary.  Lawrence Warehouse Co. v. Twohig, 224 F.2d 493 (8th Cir. 1995)(quoting Restatement (First) of Restitution § 138 (1937)).

## ANALYSIS

The most difficult part of analyzing the Plaintiffs' case is that they have not provided certain material facts, such as when the United States granted the rights-of-way, whether the Plaintiffs consented to them, whether there were any appeals, and what rights-of-way had appraisals performed on them.  In the end, however, despite the gaps in some of the factual background of the Plaintiffs' case, their Complaint presents too many problems.  The Court will dismiss the Plaintiffs' case for a variety of reasons.

I.    **THE COURT WILL DENY THE MOTIONS TO STRIKE AND GRANT THE MOTION FOR A SURREPLY.**

Both the Federal Defendants and Western Refining have moved the Court to strike Exhibit A to the Complaint (the Site Visit Report) and any reference to it in the pleadings, because the report "was prepared by an officer of the court whose impartiality was called into question" and such striking "will serve to protect the public's confidence in the judicial process." Motion to Strike ¶ 8, at 4. See Motion to Strike Report ¶ 5, at 4. The Federal Defendants argue that inclusion of the report in the pleadings is prejudicial to them. See Motion to Strike ¶ 9, at 4. Western Refining contends that the report "is redundant, immaterial, and impertinent to this case," particularly because it was suppressed in the litigation for which it was created. Motion to Strike Report ¶ 5, at 4.

A court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Hill v. Cray Research, Inc., 864 F. Supp. at 1073. See Ysais v. N.M. Judicial Standard Comm'n, 616 F. Supp. 2d at 1184 (Browning, J.); Leviton Mfg. Co., Inc. v. Zhejiang Dongzheng Elec. Co., No. CIV 05-0301, 2006 WL 4060663, at *1 (Browning, J.); Fed. R. Civ. P. 12(f). "Motions to strike, however, are generally a disfavored and drastic remedy." Sierra Club v. Tri-State Generation & Transmission Ass'n, Inc., 173 F.R.D. at 285. "To be impertinent or immaterial, the allegations must have no possible bearing on the controversy." Employers Ins. of Wausau v. Musick, Peeler, & Garrett, 871 F. Supp. at 391. Irrelevant allegations will be stricken as scandalous only if they degrade defendants' moral character, contain repulsive language, or detract from the dignity of the court. See Nault's Auto. Sales v. Am. Honda Motor Co., 148 F.R.D. at 30.

The Court sees no reason to strike the report. At the motion-to-dismiss stage, the Court is interested only in whether it has jurisdiction and whether the Plaintiffs plead a claim to relief that

is plausible on its face.  See Ridge at Red Hark, L.L.C. v. Schneider, 493 F.3d at 1177.  The Court

is not concerned with the evidentiary value of the report, and may eventually find that it cannot be

considered as evidence in this matter.  It provides, however, a basis for the Plaintiffs' factual

allegations, even if it turns out to be unreliable.  When analyzing a motion to dismiss under rule

12(b)(6), the Court must take all well-pleaded factual allegations as true, see Mobley v. McCormick,

40 F.3d at 340, and the report was the basis for the Plaintiffs' allegation that the BIA was approving

appraisals of rights-of-way at below market value.

Western Refining argues that inclusion of the report "would prejudice the ROW Grantees

by requiring them to answer allegations that [another court] determined should have no future

effect."  Motion to Strike Report ¶ 5, at 3-4.  At the motion-to-dismiss stage, because the Court takes

all well-pleaded facts in the Complaint as true, Western Refining and the other Defendants would

have to answer the allegations in the Complaint -- which refer to or rely upon the report -- with or

without the report attached.  Similarly, the remainder of Western Refining's and the Federal

Defendants' arguments on this issue appear to attack the degree to which the Court should consider

the report as substantive evidence.  Except with respect to matters of the Court's jurisdiction, the

evidentiary weight of any given document is irrelevant at this stage in the ligation.  While

attachment of the report might be redundant to the Plaintiffs' factual allegations, the Court does not

believe the report's attachment to the Complaint warrants imposition of the "disfavored and drastic

remedy" of being stricken under rule 12(f).  Sierra Club v. Tri-State Generation & Transmission

Ass'n, Inc., 173 F.R.D. at 285.  The Court therefore denies both motions to strike.

The Plaintiffs have filed a motion seeking leave to file a surreply to one of the underlying

motions to dismiss.  The Court sees no sound reason why the motion should be denied.  The Court

thus grants the Plaintiffs' motion.

**II.      THE PLAINTIFFS DO NOT HAVE STANDING TO BRING CLAIMS PERTAINING TO ALLOTMENT 11465 AND 11469.**

To have standing, a petitioner must have incurred an injury.  As all parties acknowledge, there are no rights-of-way encumbering Allotments 11465 and 11469.  The owners with interest in those allotment have not incurred any injury with regard to those allotments.  Accordingly, the Court will dismiss Kee Sandoval as a Plaintiff from this matter with regard to those allotments.

**III.     THE STATUTE OF LIMITATIONS HAS LAPSED ON CLAIMS PERTAINING TO ALLOTMENTS 1497, 11164, 11358, 11359 AND 11445.**

In response to the allegations that their Complaint is untimely, the Plaintiffs assert that 28 U.S.C. § 2401 is not jurisdictional.  See Plaintiffs' Response at 32.  Typically, a statute of limitations would not present jurisdictional issues; however, here, where the statute of limitations limits the waiver of sovereign immunity by the Federal Defendants, the issue whether the statute of limitations has passed raises jurisdictional concerns.  The reason for this jurisdictional issue is that the Court has no jurisdiction to entertain actions against the United States unless the United States has waived its sovereign immunity.  See 14 C. Wright, A. Miller, & E. Cooper, Fed. Prac. & Proc. Juris. § 3654 (3d ed.)("The natural consequence of the sovereign immunity principle is that the absence of consent [to suit] by the United States is a fundamental defect that deprives the district court of subject matter jurisdiction.").  The statute of limitations is the end-point of the window of time during which the United States has waived its immunity from suit.  See id. ("[A]n action against the government may be brought only . . . within the time limits set out in the applicable statute, which means that a statute of limitations defense cannot be waived by the government and its application in a particular case will be decided under federal, rather than state, law.").  When the limitations period expires, effectively, the United States has withdrawn its waiver of immunity, and the Court once again has no jurisdiction to entertain the action.  See Ctr. for Biological Diversity v.

-46-

Hamilton, 453 F.3d at 1334 ("Unlike an ordinary statute of limitations, § 2401(a) is a jurisdictional condition attached to the government's waiver of sovereign immunity, and as such must be strictly construed.")(quoting Spannaus v. Dep't of Justice, 824 F.2d at 55).  As the Supreme Court explained:

> When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction. United States v. Sherwood, 312 U.S. 584, 586 . . . (1941).  In particular, "[w]hen waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity." Block v. North Dakota, 461 U.S. 273, 287 . . . (1983).

United States v. Mottaz, 476 U.S. 834, 841 (1986).

The Plaintiffs do not state in their Complaint any information regarding the dates on which any of the rights-of-way were granted; nevertheless, the Federal Defendants provided the following information regarding Allotments 1497, 11164, 11358, 11359 and 11445:[9]

(i)     Allotment 1497: the Secretary of the Interior approved a right-of-way for Tucson Electric in 1973.  See Declaration of Arlene Benally ¶ 7, at 2, filed July 1, 2009 (Doc. 44-2)("Benally Dec.").

(ii)    Allotment 11164: the Secretary of the Interior approved and renewed two rights-of-way for PNM in 1998 and 2002.  See Benally Dec. ¶ 6, at 2.  The Secretary also approved two rights-of-way for Mid-America Pipeline Co. in 1995.  See Benally Dec. ¶ 6, at 2.

(iii)   Allotments 11358 and 11359: the Secretary approved and renewed a right-of-way over both of these allotments for Mid-America Pipeline Company in 1995.  These rights-of-way were later purchased by Enterprise. See Benally Dec. ¶ 3, at 2.

_____

[9] While the Court generally cannot consider information extrinsic to the Complaint when ruling on a motion to dismiss under 12(b)(6) without converting the motion to one for summary judgment under rule 56, the Court can consider evidence of underlying jurisdictional facts when ruling on a motion to dismiss for want of subject-matter jurisdiction under rule 12(b)(1).  See Alto Eldorado Partners v. City of Santa Fe, 2009 WL 1312856, at **8-9 (quoting Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)).  Because the statute of limitations is jurisdictional when it governs the window of time during which the United States has waived its sovereign immunity, see Ctr. for Biological Diversity v. Hamilton, 453 F.3d at 1334, the Court can consider this extrinsic evidence in determining whether the statute of limitations has run on the Plaintiffs' claims.

(iv)    Allotment 11445: the Secretary approved two rights-of-way over this allotment for PNM, one in 1969 and one in 1999.  <u>See</u> Benally Dec. ¶ 4, at 2.

The proper statute of limitations with regard to the Plaintiffs' claims is six years.[10]  The most recent action with regard to these five allotments was the renewal of the right-of-way over Allotment 11164 in 2002, more than seven years before the filing of the Complaint.  The Plaintiffs contend that the they were first on notice of the Federal Defendants' breach of fiduciary duty in approving rights-of-way without appraisals and without obtaining fair market values of the rights-of-way "no earlier than the public filing of the 2003 <u>Cobell</u> special master report and Lewis affidavit."  Plaintiffs' Response at 22-23 (citing to the special master's report in <u>Cobell v. Norton</u>, 394 F. Supp. 2d 164 (D.D.C. 2005)).  The Court does not agree.  The Plaintiffs knew the Federal Defendants were granting the rights-of-way for compensation.  They were put on notice of their claim at that time.  The Plaintiffs each then had six years after consenting to the rights-of-way to investigate and file any necessary claims.

The Plaintiffs attempt to extend the accrual of their claims until the Special Master's Report in <u>Cobell v. Norton</u>.  The report certainly gave the Plaintiffs more information, but they should have been asking about and determining the existence of appraisals and whether they were getting fair market value at the time they were granting rights-of-way.  <u>See</u> 25 C.F.R. § 169.3 (requiring written

---

[10] The Plaintiffs also appear to argue that there is no statute of limitations on their claims because the Supreme Court stated that "there is no federal statute of limitations governing federal common-law actions by Indians to enforce property rights."  Plaintiffs' Response at 25 (quoting <u>Oneida County, N.Y. v. Oneida Indian Nation of N.Y. State</u>, 470 U.S. at 240-41).  In <u>Oneida County, N.Y. v. Oneida Indian Nation of N.Y. State</u>, however, the Supreme Court was dealing with whether to apply a state-law statute of limitations to federal-common-law claims by Indians to enforce property rights against two counties in New York, an action as to which there was no federal-law statute of limitations.  In this case, the Court is dealing with claims against the federal government, which the express language of 28 U.S.C. § 2401 governs: "[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."

consent of the tribe or private landowner before granting a right-of-way); id. § 169.19 (requiring the same written consent for a renewal of a right-of-way).  Moreover, to allow the long extension of time the Plaintiffs seek would contravene the Congressional purpose of a statute of limitations on actions against the United States.  Because the individual plaintiffs did not file their causes of action within the six-year statute of limitations, the Court will dismiss their claims.

The Plaintiffs also assert that the limitations period has never begun to run, because under the Indian Trust Accounting Statute, Act of Nov. 10, 2003, Publ. L. No. 108-108, Tit. I, 117 Stat. 1263, "the statute of limitations shall not commence to run on any claim . . . concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss." Act of Nov. 10, 2003.  See Plaintiffs' Response at 23.  The Plaintiffs assert they have never been furnished with an accounting of their funds, and therefore the claims have never accrued.  See Plaintiffs' Response at 23-24.  The United States Court of Federal Claims, however, has held that the ITAS applies only to trust funds and not to other property such as parcels of land.  See Rosales v. United States, 89 Fed. Cl. 565, 580 (2009)("Shoshone held that ITAS only applies to trust funds, and that the statute does not toll a claim for breach of fiduciary duty regarding trust assets.")(emphasis in original)(citing Shoshone Indian Tribe of Wind River Reservation v. United States, 364 F.3d 1339, 1348-50 (Fed. Cir. 2004)); Oenga v. United States, 83 Fed. Cl. 594, 611 (2008)("[T]he Federal Circuit has indicated, as set forth above, that the ITAS is limited to claims of failure or delay in activities such as '(1) collecting payments under the . . . contracts, (2) depositing the collected monies into the Tribes' interest-bearing trust accounts, or (3) assessing penalties for late payment.'")(citing Shoshone Indian Tribe of Wind River Reservation v. United States, 364 F.3d at 1350-51).  The Court agrees that the plain language of the ITAS applies to claims

of mismanagement of trust "funds."  See Act of Nov. 10, 2003 ("the statute of limitations shall not commence to run on any claim . . . concerning losses to or mismanagement of <u>trust funds</u>")(emphasis added).  The <u>Oxford English Dictionary Online</u> defines "funds" as "Money at a person's disposal; pecuniary resources." <u>Oxford English Dictionary Online</u>, "fund, *n*." (2d ed. 1989, Oxford University Press), <u>available</u> at http://dictionary.oed.com/cgi/entry/50090902 (last visited Apr. 1, 2010).[11]  As the Court understands the Plaintiffs' claims, they allege a breach of fiduciary duty regarding the handling of the property that the United States held in trust for their benefit and not the failure to collect monies, deposit them in the Tribes' account, or assess penalties for late payments.  The ITAS did not toll the statute of limitations in this case.

## IV.    <u>THE PLAINTIFFS' CLAIMS ARE NOT RIPE FOR REVIEW.</u>

The Defendants assert that the Court must dismiss the Plaintiffs' Complaint because the claims are not ripe for review.  Plaintiffs argue that their matter is ripe because it is redressable now. <u>See</u> Plaintiff's Response at 41.  Considering the factors for determining ripeness set forth by the Tenth Circuit in <u>Sierra Club v. U.S. Department of Energy</u>, 287 F.3d 1256 (10th Cir. 2002), this matter is not ripe for review.  <u>See</u> 287 F.3d at 1262-63.  The causes of action are not ripe for review until there has been a final agency action.  <u>See</u> <u>McKart v. United States</u>, 395 U.S. 185, 193 (1969)("The doctrine [of exhaustion of remedies] provides 'that no one is entitled to judicial relief

---

[11] <u>Black's Law Dictionary</u> defines a "fund" as "[a] sum of money or other liquid assets established for a specific purpose."  <u>Black's Law Dictionary</u> at 743 (9th ed. 2009).  <u>Black's Law Dictionary</u> defines a "liquid asset" as "[a]n asset that is readily convertible into cash, such as a marketable security, a note, or an account receivable."  <u>Id.</u> at 134 (defining "current asset" which is "[a]lso termed *liquid asset* . . . .).  <u>See</u> <u>The American Heritage Dictionary of the English Language</u> at 735 (3d ed. 1992)("**2. a.** A sum of money or other resources set aside for a specific purpose . . . **b. funds.** Available money, ready cash . . . .").  Land is unlikely to be considered a liquid asset, as it generally cannot "readily" be converted into cash unless the owner is willing to sell the property at a substantial loss.

-50-

for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'"); Dry Creek Lodge, Inc. v. United States, 515 F.2d 926 (10th Cir. 1975) (acknowledging the rule that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted," but finding that it is not a jurisdictional doctrine and requiring the plaintiff be able to argue on the issue before dismissal); Coosewoon v. Meridian Oil Co., 25 F.3d 920, 924 (10th Cir. 1994)("Under Department of Interior regulations, if an agency decision is subject to appeal within the agency, a party must appeal the decision to the highest authority within the agency before judicial review is available.")(citing 25 C.F.R. § 2.6(a)).  None of the Plaintiffs have asserted that they have appealed the granting of the rights-of-way.  The Plaintiffs believe that redress for them must be through the court system.  There is, however, an administrative procedure established, pursuant to the same statutes under which the Plaintiffs assert jurisdiction, and which provide them with a means of redress.  By not exhausting their administrative remedies, the Plaintiffs have failed to create an administrative record supporting their claims.  Certainly, because there are few specific details regarding the granting of the rights-of-way in the Complaint itself, the Court would benefit from further development through the administrative process of the issues presented.  Judicial intervention would inappropriately interfere with the agency's administrative action.   The Court, therefore, finds that the Plaintiffs' claims are not ripe for review and will dismiss them.

## V.     **THE PLAINTIFFS HAVE NOT EXHAUSTED ADMINISTRATIVE REMEDIES.**

The Plaintiffs contend that they were not required to exhaust their administrative remedies with regard to their claims, because they are challenging "an agency-wide breach of trust."  What the Plaintiffs are trying to do is circumvent the exhaustion requirement.  The Plaintiffs had a right at the time the rights-of-way were granted to appeal the decision of the BIA.  The Department of

Interior's regulations, 25 C.F.R. Part 2, set forth the appeal process and exhaustion requirement.  To

the Court's knowledge, from a careful review of the Complaint and the briefs on this motion, no

appeals were made.  Now, years later, in fact many years later for some, even after some of the

Plaintiffs agreed to renew the rights-of-way, these Plaintiffs are contending that they should be able

to contest the United States' actions.  In approving the rights-of-way, there was an appeal process

and an exhaustion requirement.  The exhaustion requirement is not waivable, even by attempting

to become a member of a class.  See Arctic Slope Native Ass'n v. Sebelius, 583 F.3d 785, 796

(Fed. Cir. 2009).[12]

The Plaintiffs argue that exhaustion is not required because the Defendants do not point a

procedure that would give them relief.  See Plaintiffs' Response at 62.  There is relief and a

procedure for review set forth in the statutes.  Because the Plaintiffs did not exercise their

administrative rights and missed their opportunity for redress, however, the Plaintiffs have now

formulated their argument into a challenge to a "multi-year policy" of the Federal Defendants

neglecting their trust duties. The Court cannot properly permit them to circumvent the proper

processes and continue to pursue a claim in the federal court; to do so would encourage claimants

to litigate and disregard the administrative process.  The Plaintiffs contend that, because they allege

"a systematic failure," there is not "procedure that would give [them] relief."  Plaintiffs' Response

at 41.  Having not sought redress through the proper appeals process within the Department of

Interior for each right-of-way, however, the Plaintiffs cannot now seek redress in federal court for

_____

[12] To the extent that the Plaintiffs are correct that the Court has discretion to allow the case
to proceed without exhausting administrative remedies, see Plaintiffs' Response at 33-39, the Court
finds that the creation of an administrative record and the paring down of claims that could occur
before an experienced Administrative Law Judge would substantially aid the Court in coming to a
proper resolution of this matter.

all rights-of-way.

The Plaintiffs' arguments also do not fall under the three broad exceptions to the exhaustion requirement. The Plaintiffs have not argued that "requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action." McCarthy v. Madigan, 503 U.S. at 146-47. The Plaintiffs have also not argued that "an administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief.'" Id. at 147 (quoting Gibson v. Berryhill, 411 U.S. 564, 575 n.14 (1973)). Moreover, the Plaintiffs have not shown that "an administrative remedy may be inadequate" because "the administrative body is shown to be biased or has otherwise predetermined the issue before it." McCarthy v. Madigan, 503 U.S. at 147. Indeed, the Plaintiffs had recourse through the administrative-appeal process, and they did not avail themselves of the process.

The Plaintiffs argue that this remedy is inadequate, because they are alleging not "a mere failure to act on request" but "a breach of trust owing to the Secretary's failure to perform express statutory duties." Plaintiffs' Response at 35. That the Plaintiffs are asserting a failure to perform a duty does not justify not seeking an appeal through the proper process. They never gave the appeal process an opportunity to work for them. The administrative process is the forum in which the Plaintiffs had to seek redress; they cannot bypass that process unless they are able to show that exhaustion would be futile. See Fizer v. Safeway Stores, Inc., 586 F.2d 182, 183 (10th Cir. 1978); White Mountain Apache Tribe v. Hodel, 840 F.2d 675, 677 (9th Cir. 1988)(stating that futility will be found only in "exceptional circumstances" such as "by virtue of a preannounced decision by the final administrative decision-maker," or "objective and undisputed evidence of administrative bias which would render pursuit of an administrative remedy futile"). The Plaintiffs' arguments do not evidence futility in the usual sense of the word, i.e., that the administrative procedure would not do

any good.  See The American Heritage Dictionary of the English Language at 738 ("fu•tile . . .
**1.** Having no useful result.  **2.**  Trifling and frivolous . . . .").

The Plaintiffs assert that exhaustion would be futile because they are asserting a "systemic"
violation.  Plaintiff's Response at 38-39.  Yet the Plaintiffs' Complaint does not describe a violated
general policy; instead, it asserts specific violations of federal law, the kind of violation that can be
remedied in an administrative proceeding.  Furthermore, in White Mountain Apache Tribe v. Hodel,
the plaintiffs alleged general "poor performance on the part of the government as trustee for the
Tribe's natural resources on its reservation in Arizona" -- something that could likewise be
considered a "systemic" violation.  840 F.2d at 676.  See id. at 677 ("[The plaintiffs'] complaints
concern a series of management decisions within the Bureau of Indian Affairs and the Department
of the Interior.").  The United States Court of Appeals for the Ninth Circuit found that the claim was
not one that is exempt from the APA's exhaustion requirements.

> This is not such an exceptional case.  The Secretary of the Interior has neither made
> a definitive statement concerning the management decisions at issue, nor has the
> Tribe offered any evidence of actual bias in the BIA administrative process.  In
> addition, the government has offered evidence of its attempts to solicit the Tribe's
> opinions concerning the management of its resources.  Thus, the Tribe has not
> demonstrated that administrative remedies in this case are futile.
>
> The Tribe urges that delay is harmful because continuing damage to its natural
> resources is occurring as this case proceeds.  However, as the government notes,
> administrative decisions affecting the Tribe are ongoing.  Opportunities to make the
> requisite administrative record continue to pass the Tribe by as it continues
> prematurely to invoke district court jurisdiction.

White Mountain Apache Tribe v. Hodel, 840 F.2d at 678.  The Ninth Circuit thus held that it is
"exceptional circumstances," not "systemic violations," that might relieve a plaintiff of the duty to
exhaust his administrative remedies prior to initiating suit in federal court.  The Court agrees, and
likewise agrees that the fact that a violation may be continuous or ongoing is not such an exceptional

circumstance.

The Plaintiffs also contend that they did not need to exhaust their remedies because they did not receive notification from the BIA of their right to appeal.  They argue that the exhaustion requirement was forfeited because of administrative inaction.  <u>See</u> Plaintiffs' Response at 49. Failure of the BIA to provide a notice does not necessarily cancel the administrative-remedy process.  <u>See Cheyenne-Araphao Tribes Okla. v. United States</u>, 966 F.2d 583, 588 (10th Cir. 1992)(citing 25 C.F.R. § 2.4 (1981)).  Instead, failure of the agency to give notice of the initial agency action simply extends the time in which the plaintiff can appeal that action.  To the extent that the Plaintiffs did not know about the agency action in this case, their time to appeal that action to the reviewing authority begins to run from the time they received notice.  <u>See Cheyenne-Araphao Tribes Okla. v. United States</u>, 966 F.2d at 588 ("[F]ailure to give such notice [of administrative action] extends the time in which appeal from the decision may be taken.  The regulation is explicit: when proper notice has not been given, the right to appeal continues until such notice is received.").[13]   In 25 C.F.R. § 2.7, the Department of the Interior has stated:

> The official making a decision shall give all interested parties known to the decisionmaker written notice of the decision by personal delivery or mail. . . . Failure to give such notice shall not affect the validity of the decision or action but the time to file a notice of appeal regarding such a decision shall not begin to run until notice has been given[.]

<u>See also</u> 25 C.F.R. § 2.8(a) ("A person or persons whose interests are adversely affected, or whose ability to protect such interests is impeded by the failure of an official to act on a request to the official, can make the official's inaction the subject of appeal, as follows . . . .").

Because the Plaintiffs have not exhausted their administrative remedies, their cause of action

---

[13] The Tenth Circuit in <u>Cheyenne-Araphao Tribes Okla. v. United States</u> referred to 25 U.S.C. § 2.4, but it appears that the passage quoted has been moved to § 2.7.

is not subject to judicial review.  Further, because they have not exhausted their administrative remedies, i.e., there has been no final agency action, Congress has not waived sovereign immunity under the APA.  A prerequisite to the waiver of sovereign immunity under the APA is that there be final administrative action.  See 5 U.S.C. § 4.  While there is an exception to this requirement for non-statutory review, the exception applies only "where the absence of federal court jurisdiction over an agency action 'would wholly deprive' the aggrieved party' of a meaningful and adequate means of vindicating its statutory rights.'"  Long Term Care Partners, LLC, 516 F.3d at 233 (quoting Bd. Governors, Fed. Reserve Sys. v. Mcorp. Fin., Inc., 502 U.S. 32, 43 (1991)).  Here, the Plaintiffs have an adequate and statutorily prescribed administrative review process available to them, and they did not avail themselves of that process.  Because the Plaintiffs have not exhausted their administrative remedies and do not fall into any exception to the final-agency-action requirement, Congress has not waived sovereign immunity, and the Court will thus dismiss the suit against the Federal Defendants.

## VI.   THE COURT CANNOT PROPERLY IMPOSE A CONSTRUCTIVE TRUST ON THE CORPORATE DEFENDANTS' ASSETS.

The Plaintiffs contend that the Corporate Defendants knew or should have known about the United States' breach of trust and, as a result, the Corporate Defendants have caused a constructive trust to be imposed upon their rights-of-way.  See Complaint ¶¶ 22, 43 and 44, at 6, 11.  The Plaintiffs failed to avail themselves of their administrative remedies, and, as a result, they missed their opportunity to contest the appraised value of their rights-of-way and obtain redress. Recognizing that they missed that opportunity, the Plaintiffs cannot now seek redress against the Corporate Defendants for the United States' alleged acts or omissions.

The Plaintiffs seek a constructive trust over the rights-of-way that the Corporate Defendants

currently hold.  "A constructive trust is a legal fiction, 'an equitable remedy devised to prevent unjust enrichment and compel restitution of property that in equity and good conscience does not belong to the Defendant.'"  United States v. Andrews, 530 F.3d 1232, 1237 (10th Cir. 2008). Black's Law Dictionary defines it as "[a]n equitable remedy that a court imposes against one who has obtained property by wrongdoing."  Black's Law Dictionary at 1649 (9th ed. 2009).[14]  As a remedy, before it can be awarded, the Plaintiffs must demonstrate the Corporate Defendants' liability for wrongdoing.  As an equitable remedy, the Plaintiffs must also convince the court that it would be equitable to award it, as equitable remedies are generally at the trial court's discretion. See Jicarilla Apache Tribe v. Andrus, 687 F.2d 1324, 1333 (10th Cir. 1982).

As an initial matter, the Plaintiffs have not asserted sufficient facts to establish a plausible claim against the Corporate Defendants for breach of trust, justifying a constructive trust.  The Court cannot discern, from the facts alleged, precisely what the Plaintiffs allege that the Corporate Defendants knew.  The Plaintiffs allege that "the ROW defendants either knew, or in the exercise ordinary care, should have known" of the breaches of trust.  That allegation, however, is just a "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements," and the Supreme Court in Ashcroft v. Iqbal declared that such was insufficient to state a claim.  129 S. Ct. at 1949-50.  The Plaintiffs allege a range of prices at which someone at the Navajo office -- someone who is not a Defendant in this action -- was appraising rights-of-way and allege that the price was "far below fair market value," but there is no indication what fair market value is or how significant a departure these appraised prices were.  In a separate paragraph, the

_____

[14] Black's Law Dictionary also directs the Court to a helpful explanatory quote: "When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest equity converts him into a trustee."  Beatty v. Guggenheim Exploration Co., 122 N.E. 378, 380 (N.Y. 1919)(Cardozo, J.)

Plaintiffs allege that the BIA was aware that the appraisals which it was approving were many times lower than what the Navajo Nation was charging for similar rights-of-way, but that fact again fails to speak to the Corporate Defendants' knowledge.

The most complete allegation of the Corporate Defendants' knowledge is in paragraph 38, in which the Plaintiffs conclusorily state: "Similarly, the [Corporate] defendants knew that they were paying far less to the Navajo Allottees for exactly the same access that had cost them many times more on adjacent or nearby Navajo Nation lands and, in some cases, on adjacent or nearby fee land." Complaint ¶ 38, at 10. These allegations have two problems. First, they do not provide the Court with a basis to compare the prices that the Corporate Defendants paid to the fair market value, and thereby determine whether the Corporate Defendants were put on notice that the United States was short-changing the Indians. More importantly, the Complaint is silent whether the Corporate Defendants, in their dealings with the United States to acquire these rights-of-way, would have known of the restrictions upon the Federal Defendants to provide the Plaintiffs with no less than fair market value for the rights-of-way. Thus, even if the Court were to find that having knowledge of the United States' failure to properly perform under the statutory and regulatory scheme would justify imposition of a constructive trust in this case, the factual allegations do not plausibly state such a claim.

If the Court were to find only that the Plaintiffs had properly pled their claim for constructive trust against the Corporate Defendants under Twombly and Iqbal, the Court probably would give the Plaintiffs leave to amend. The flaws in the pleadings themselves are likely fixable. The possibility of amendment raises the question, then, whether the Court should allow any constructive trust to be imposed on the Corporate Defendants under the theory that the Plaintiffs suggest.

It appears that the Plaintiffs recognize that significant and possibly insurmountable barriers

stand in the way of bringing their claims directly against the United States in this case, and that is what prompted them to stretch to try to come up with theories under which they could sue the Corporate Defendants as well, or, as is now the case, alone.  In the first instance, they do so by trying to hold the Corporate Defendants liable for the United States' alleged breach of trust and seek, as their remedy, a constructive trust on the rights-of-way.  The Court is faced with the questions whether it would be equitable to hold the Corporate Defendants liable or impose such a remedy against them in the absence of the United States as a party, and/or whether the Court should impose such a remedy before the administrative proceeding finds that the United States has violated its trust obligations.  Even assuming the Corporate Defendants were aware of the facts that the Plaintiffs allege, the Court concludes that it should not impose such a trust on the Corporate Defendants, at least until the administrative proceeding finds the United States breached its obligations.  The Court finds that it would be inequitable to force the United States and the Corporate Defendants to defend the United States' conduct in a matter in which the United States is not a party, especially where the action could be brought against the United States -- a highly solvent defendant -- if done in the appropriate forum.  The Court believes that, if it allows the constructive trust action to proceed where the United States is not a party and the Plaintiffs have not exhausted their remedies against the United States, it would, in effect, be allowing the Plaintiffs to make an end-run around the exhaustion requirement and make the United States defend its actions here.  The better procedure is to require the Plaintiffs to proceed against the United States in its administrative proceeding before seeking a remedy against the Corporate Defendants in a separate action against only them.

Against the Corporate Defendants, the Plaintiffs assert that they can obtain relief even without proving the Corporate Defendants participated in the breach of trust.  See Plaintiffs' Response at 25.  The Plaintiffs argue that, "[u]nder federal Indian law, a grant made on an allottee's

land in violation of U.S. statutory law is void -- and cannot be remedied by severing the unlawful part -- thus divesting grantees of any right." Plaintiffs' Response at 25 (citing Smith v. McCullough, 270 U.S. 456, 463-65 (1926); Hallam v. Commerce Min. & Royalty Co., 49 F.2d 103, 103 (10th Cir. 1931)).   Both of these cases involve an allottee who granted interests in his or her property, which interest he or she did not have the power to grant.  Here, however, there is no dispute that the Plaintiffs had the power to give the rights-of-way.  The issue in this case is whether the proper procedures were followed and adequate compensation given, and not whether the action taken was made without proper authority.

The Plaintiffs also contend that the Corporate Defendants are liable to the Plaintiffs as third parties.  See Plaintiffs' Response at 15 (citing Seminole Nation v. United States, 316 U.S. at 296). The Plaintiffs argue that, because the Corporate Defendants "reaped this windfall" they, and not the taxpayers, should be held accountable.  The Supreme Court in Seminole Nation v. United States stated: "It is a well established principle of equity that a third party who pays money to a fiduciary for the benefit of the beneficiary, with knowledge that the fiduciary intends to misappropriate the money or otherwise be false to his trust, is a participant in the breach of trust and liable therefor to the beneficiary." 316 U.S. at 296.  The facts of this case, however, are substantially different from those in  Seminole Nation v. United States, and the Court finds it inapplicable.  In that case, the plaintiff alleged that the third-party whom it sought to hold accountable -- the United States -- was aware

> that the [fiduciaries, the Seminole Nation tribal officials] were misappropriating the [beneficiaries', i.e., the Seminole Nation's] funds entrusted to them, and robbing the [beneficiaries] of an equal share of the [trust] income.  That the reports . . . show[ed] conclusively that the [fiduciaries] were notoriously and incurably corrupt, that every branch of the service was infested with favoritism, graft and crookedness, and that by such methods the [fiduciaries] acquired large fortunes, while the other members entitled to share in the tribal income received little benefit therefrom.

316 U.S. at 295-96.  Thus, in <u>Seminole Nation v. United States</u>, the defendant -- the United States -- was alleged to be aware of something that constituted a breach of fiduciary duty by other fiduciaries.[15]   In this case, the most that can be said from the allegations is that the Corporate Defendants knew that they got a good deal on rights-of-way when doing business with the Federal Defendants, or at least a better deal than they were getting from the Navajo Nation.  The extreme situation in <u>Seminole Nation v. United States</u> was one that counseled for resort to doctrines of equity.  In this case, the Federal Defendants' conduct, if the Plaintiffs can even prove that it was wrongful, was not so much corrupt as it was negligent, incomplete, or incompetent, and the Plaintiffs have legal avenues through which they can pursue their claims against the Federal Defendants and perhaps, ultimately, have their alleged injuries redressed without diluting the property rights of the Corporate Defendants.  The Court therefore does not find it equitable to impose fiduciary liability on the Corporate Defendants, at least until the administrative proceeding establishes that the United States breached its legal duty to the Plaintiffs.[16]

The posture of <u>Seminole Nation v. United States</u> was peculiar and is materially different

---

[15] In addition, the United States was not paying money to the tribe per capita, as it was legally required to do.  Rather, knowing of the corruption and "crookedness" of the Seminole Nation tribal officials, the United States was giving the money to the officials and expecting them to distribute it to the individual Seminole tribe members.  Another relevant distinction between this case and <u>Seminole Nation v. United States</u> is thus that, in this case, there is no allegation that the money that the Corporate Defendants are giving to the United States for the benefit of the Navajo allottees is being intercepted or otherwise not reaching its intended recipients; rather, the Plaintiffs simply allege that the amount being paid is not enough.

[16] The Court is unconvinced by the Plaintiffs' reliance on ERISA cases imposing liability on third-parties based on a provision that expressly provides for a cause of action against a third-party who knowingly participates in a fiduciary violation.  <u>See</u> <u>Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.</u>, 530 U.S. 238, 250-51 (2000); <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 256 (1993).  The Plaintiffs have cited no statute that would create such third-party liability in this case, nor is the Court aware of any.

from the posture of this case.  In this case, the alleged fiduciary is the United States, and the third-

parties that the Plaintiffs seek to hold accountable are private business entities.  In Seminole Nation

v. United States, the fiduciaries that were allegedly fraught with corruption were the Seminole tribe

officials, and the third-party that the Seminole Nation sought to hold accountable was the United

States, a fiduciary with respect to the Seminole Nation.  That the relevant defendant -- the United

States -- was a fiduciary to the plaintiffs was not lost on the Supreme Court, which stated:

> The Government contends that since those payments were made at the request of the
> tribal council, the governing body of a semi-autonomous political entity, possessing
> the power to enter into treaties and agreements with the United States, the tribe is not
> now entitled to receive payment a second time, and that, despite the fact that the
> Treaty of 1856 provided that the payments were to be made per capita for the benefit
> of each individual Indian, these payments at the request of the General Council
> discharged the treaty obligation because the agreement was one between the United
> States and the Seminole Nation and not one between the United States and the
> individual members of the tribe.
>
> The argument for the Government, however sound it might otherwise be, fails to
> recognize the impact of certain equitable considerations and the effect of the
> fiduciary duty of the Government to its Indian wards.
>
> * * * *
>
> Furthermore, this Court has recognized the distinctive obligation of trust incumbent
> upon the Government in its dealings with these dependent and sometimes exploited
> people. . . .  In carrying out its treaty obligations with the Indian tribes the
> Government is something more than a mere contracting party. . . . .

Seminole Nation v. United States, 316 U.S. at 295-96 (emphasis added).  The trust relationship

between the Seminole Nation and the United States was significant to the Supreme Court's decision

to invoke an equitable doctrine of constructive trust and to hold the United States liable in that case.

The Corporate Defendants have no fiduciary duties directly to the Plaintiffs; rather, each Corporate

Defendant "is [no]thing more than a mere contracting party."  Id. at 296.  Instead, the Corporate

Defendants' have fiduciary duties to their shareholders to get the best deal they legally can.  The

United States' fiduciary duty to the Seminole Nation, combined with clearly fraudulent and criminal conduct, gave the Supreme Court in Seminole Nation v. United States a more substantial equitable basis to hold the United States liable that the facts do here to hold the Corporate Defendants liable. The allegations in the Complaint in this case, even assuming their truth, do not provide the kind of substantial basis in equity to justify holding the Corporate Defendants liable for the United States' alleged breach of trust. Seminole Nation v. United States is therefore inapposite. The Court is also skeptical of the wisdom of establishing precedent that could cause private companies to distrust engaging in business dealings with the United States because those companies could be held liable for the United States' misconduct toward Indians. The Plaintiffs' claim is properly against the United States, and can be vindicated through completion of the administrative process and then, if they are still not satisfied, in federal district court. The Court will therefore dismiss the Plaintiffs' vicarious-fiduciary-breach claims against the Corporate Defendants. Because the Plaintiffs do not adequately plead their claim, and because the case without the United States is now not one in which it would be equitable to hold private third-party companies liable for the United States' alleged breaches of trust in the absence of an exhaustion of administrative procedures against the United States, the Court will dismiss the claims against the Corporate Defendants for constructive trust.

The Court does not address a case in which both the United States and the Corporate Defendants are properly before the Court, a case in which the administrative procedures against the United States have been exhausted and there are findings of conclusive knowledge on the part of the Corporate Defendants that the United States is intentionally or recklessly defrauding the Plaintiffs, or a case in which the United States or another fiduciary is known to be insolvent and unable to satisfy the judgment that may provide the Plaintiffs the remedy they seek. None of those cases are before the Court. If the Court were faced with one of those situations, it may find that the equities

weigh differently, as the Supreme Court did in Seminole Nation v. United States. Because there is

the possibility that the Plaintiffs may be able to properly plead such a case in the future, after they

exhaust the administrative process against the United States, the Court will dismiss the claim

without prejudice to it being re-filed if and when the circumstances change such that equitable relief

might be appropriate.

## VII.   THE PLAINTIFFS' ALLEGATIONS SHOW THAT THEY HAVE NO TRESPASS CLAIM AT THE PRESENT TIME.

The Plaintiffs contend that, because the Corporate Defendants knew or should have known

of the United States' breach of trust, the Corporate Defendants' construction and maintenance of its

pipelines constitutes trespass.  See Complaint ¶¶ 23, 45, at 6, 11.  The Plaintiffs seek both trespass

damages and equitable relief from the Corporate Defendants.  They request cancellation of the

rights-of-way and removal of its pipelines.  See id. ¶ 52 at 14-15; id. ¶ 55 at 16-17.  The Complaint

does not specify whether the Plaintiffs are proceeding under state or federal law for their claims of

trespass and ejectment, but the Plaintiffs' Response clarifies twice that they are proceeding under

a federal theory.  See Plaintiffs' Response at 43-45 (explaining that preemption arguments are

irrelevant because the Plaintiffs are proceeding under a federal theory for their trespass and

ejectment claims).

Nevertheless, it is not clear under what authority the Plaintiffs believe they can bring claims

for trespass and ejectment.  They cite to 25 U.S.C. § 325 as the basis for their claims, see Plaintiffs'

Response at 44-45 ("Plaintiffs pursue a right founded on a statute, i.e., the Indian Lands Rights-of-

Way Act."), but that statute does not create the cause of action they seek to assert.  Rather, that

statute states:

> No grant of a right-of-way shall be made without the payment of such compensation
> as the Secretary of the Interior shall determine to be just.  The compensation received

on behalf of the Indian owners shall be disposed of under rules and regulations to be prescribed by the Secretary of the Interior.

25 U.S.C. § 325.  This statute proscribes granting of rights-of-way under certain conditions, but does not purport to create a private right of action for trespass where a right-of-way applicant acquires one that does not satisfy those conditions.

Many of the cases that the Plaintiffs cite agree that federal law governs claims by Indians to enforce property rights.  See Wilson v. Omaha Indian Tribe, 442 U.S. 653, 670-71 (1979)("In these circumstances, where the Government has never parted with title and its interest in the property continues, the Indians' right to the property depends on federal law, 'wholly apart from the application of state law principles which normally and separately protect a valid right of possession.'")(quoting Oneida Indian Nation v. County of Oneida, 414 U.S. at 677); Jicarilla Apache Tribe v. Andrus, 687 F.2d at 1341 (stating that a state-court case "is not controlling here because we are concerned with oil and gas leases on Indian lands which are governed by federal law.").[17]  The Court has no reason to doubt that the Plaintiffs' claims implicate federal rights and should be analyzed under federal law.  The Court need only determine what law provides the right of action that they seek to assert and determine whether they state a claim thereunder.  The Court concludes that, at the present time, they do not.

The United States Court of Appeals for the Ninth and Second Circuits have found that there exists a federal common law cause of action for trespass on Indian lands.  See United States v. Milner, 585 F.3d 1174, 1182-83 (9th Cir. 2009)(stating that "[f]ederal common law governs an

---

[17] The Court notes that Jicarilla Apache Tribe v. Andrus emphasizes that, where the plaintiff seeks equitable relief, as the Plaintiffs seek in this case, "granting such relief is within the sound discretion of the court even if the ground on which the plaintiff seeks [such equitable relief] has been clearly established."  687 F.2d at 1333.  The decision to deny such equitable relief is reversible only upon a showing that the discretion has been abused.  See id.

action for trespass on Indian lands" and asserting that federal common law of trespass "generally comports with the Restatement of Torts"); Cayuga Indian Nation of N.Y. v. Pataki, 413 F.3d 266, 281 (2d Cir. 2005)("The Supreme Court has recognized a variety of federal common law causes of action to protect Indian lands from trespass, including actions for ejectment, accounting for profits, and damages.")(quoting United States v. Pend Oreille Pub. Util. Dist. No. 1, 28 F.3d 1544, 1549 n. 8 (9th Cir.1994)).  "Under the Restatement, a person is liable for trespass if he intentionally causes a thing to enter land in the possession of another or fails to remove from the land a thing which he is under a duty to remove."  United States v. Milner, 585 F.3d at 1182-83 (internal citations, quotation marks, and alterations omitted).  The Restatement further clarifies that such entry is an "intrusion" only when "the possessor's interest in the exclusive possession of his land has been invaded by the presence of a person or thing upon it without the possessor's consent." Restatement (Second) of Torts § 158 cmt. c (1965).

In this case, the Corporate Defendants are using the allotment lands pursuant to consent.  So far as the Court understands the Plaintiffs' allegations, each of the Corporate Defendants currently have rights-of-way passing through the allotment lands.  That would require the Corporate Defendants to have gone through the steps necessary to be granted a right-of-way, which include receiving consent, in writing, from the relevant tribe or landowner, see 29 C.F.R. § 169.3; id. § 169.19, and issuance of the right-of-way by the United States.  The Plaintiffs do not contest that the Defendants properly executed this portion of the right-of-way granting process.  Both the United States and the relevant tribe or individual, therefore, must have given the Corporate Defendants written consent, in the form of a right-of-way, to use the land at issue.  Now that they have the rights-of-way, the Corporate Defendants have legal authorization to use the lands.  The Court thus finds that the Plaintiffs' Complaint states facts from which it is clear that, at this point, they have

no claim for trespass against the Corporate Defendants.

The Court also finds, however, that the Plaintiffs' claims against the Corporate Defendants might be premature.  If the Plaintiffs succeed in having the rights-of-way declared invalid through their claims against the United States, the Plaintiffs should have another opportunity to assert that the Corporate Defendants are trespassing upon land in their possession.  Until that time, however, the Court will not invalidate the rights-of-way that the United States has granted, based on allegations of misconduct by the United States, in a suit solely against a third-party corporate right-of-way grantee.  The Plaintiffs have recourse directly against the United States through administrative action and, once that administrative remedy has been exhausted, if the Plaintiffs have not received the relief they seek, they will be able to bring claims against the United States in federal district court.  At that time, the district court may entertain claims against both the United States and the Corporate Defendants simultaneously.  Because the Plaintiffs do not state a claim for trespass or ejectment against the Corporate Defendants at the present time, however, the Court will dismiss those claims, but do so without prejudice to their being reasserted once administrative remedies have been exhausted or the rights-of-way have otherwise been invalidated.

The Plaintiffs might argue that the Court's interpretation of the law conflicts with Indian law; however, the Plaintiffs are not prevented from bringing their claims, if done in the proper venue. The APA regulations allow for a redress of grievances and, once those remedies are exhausted, the Plaintiffs will have recourse to the federal courts.  With a remedy in the appropriate forum, the Court does not see any conflict with Indian law.[18]

---

[18] The Plaintiffs request the Court to certify the class and for injunctive relief on behalf of all Navajo Allottees with rights-of-way on their allotment in the Checkerboard Area within the Navajo Nation.  See Complaint at 12.  The Plaintiffs assert that they meet the preconditions for class certification under rule 23(a)

_____
UNITED STATES DISTRICT JUDGE

_Counsel_:

Catherine Baker Stetson
Stetson Law Offices, P.C.
Albuquerque, New Mexico

-- and --

Thomas R. Meites
Paul W. Mollica
Jamie S. Franklin
Meites, Mulder, Mollica & Glink
Chicago, Illinois

     _Counsel for Plaintiffs_

_____

     because (1) the class is so numerous (believed to be in the hundreds or thousands) that joinder of all members is impracticable; (2) there are questions of law or fact common to the class concerning the lawfulness of the United States' actions and the appropriate remedy; (3) the claims or defenses of the named plaintiffs are typical of the claims or defenses of the class because they were all denied appraisals and fair market value for the [rights-of-way]; and (4) the named plaintiffs will fairly and adequately protect the interest of the class.

Complaint ¶¶ 48 & 51, at 11-13.  Because the Court has decided to dismiss the Plaintiffs' case, the Court need not address their request for class certification.  The Court has dismissed the individual Plaintiffs' claims against the Federal Defendants for failure to exhaust their administrative remedies. The Court has also dismissed the claims against the Corporate Defendants for failure to state a claim upon which relief can be granted, and because the FERC has jurisdiction over the claims involving interstate natural gas pipelines.  There is thus no Plaintiff with standing to bring the cause of action. The Plaintiffs ask the Court to infer "that out of [the] thousands of members [of the association], one or more would suffer the disputed [rights-of-way]."  Plaintiffs' Response at 39.  Of the individual Plaintiffs presented to the Court, however, none have standing.  There has not been any indication that the proposed class has sought any administrative remedies.  The Court is not prepared to accept the inference that the Plaintiffs propose.  Accordingly, the Court will decline the Plaintiffs' request to certify the class.  Because there is no class, the Court also need not discuss whether to designate counsel for the class.

Tom Sikora
El Paso Corporation
Houston, Texas

-- and --

Mark F. Sheridan
Kristina M. Martinez
Holland & Hart LLP
Santa Fe, New Mexico

-- and --

John A. Bryson
Holland & Hart LLP
Washington, D.C.

-- and --

Troy A. Eid
Jennifer H. Weddle
Greenberg Traurig LLP
Denver, Colorado

>    *Counsel for Defendants El Paso Corporation and El Paso Natural Gas Company*

Lynn H. Slade
William C. Scott
Walter E. Stern
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

>    *Counsel for Defendants Enterprise Products Partners, L.P., Transwestern Pipeline Co.,*
>    *LLC, Kinder Morgan Energy Partners LP, Kinder Morgan Management LLC, and Knight,*
>    *Inc.*

David F. Cunningham
Thompson, Hickey, Cunningham, Clow & April, P.A.
Santa Fe, New Mexico

>    *Counsel for Defendants Public Service Company of New Mexico and Tucson Electric Power*
>    *Company*

John E. DeWulf
Timothy J. Sabo
Darlene M. Wauro
Roskha DeWulf & Patten, PLC
Phoenix, Arizona

*Counsel for Defendant Tucson Electric Power Company*

Clyde F. Worthen
Keleher & McLeod
Albuquerque, New Mexico

*Counsel for Defendant New Mexico Gas Company*

Andrew G. Schultz
Nicholas Sydow
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

*Counsel for Defendant Western Refining Pipeline Company*

Sara E. Costello
Jody Schwarz
United States Department of Justice
Environment & Natural Resources Division
Washington, D.C.

*Counsel for Defendant Ken Salazar, Secretary of the Interior, and the United States*